**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED MARCH 25, 2002**

DAVID LeROUX, MICHAEL GRAY,
and ROBERT L. ELLIS,

    Plaintiffs,

v                                          No. 120338

SECRETARY OF STATE and
DIRECTOR OF ELECTIONS,

    Defendants,

and

SUZANNE L. ANDERSON, SHARON
YENTSCH, and BRADLEY
VAN HAITSMA,

    Intervening Defendants.
_____

PER CURIAM

In this original action, plaintiffs challenge the plan for redistricting Michigan's fifteen seats in the United States House of Representatives adopted by 2001 PA 115. Plaintiffs claim that the statute was not validly enacted because the bill passed by the Legislature was changed by the Secretary of the Senate before presentation to the Governor for his approval. Second, they contend that the plan fails to comply with Michigan statutory requirements for congressional redistricting established by 1999 PA 221. We conclude:

(1) 2001 PA 115 was validly enacted because the changes made before submission to the Governor were technical corrections that do not violate the provisions of the Michigan Constitution regarding enactment of legislation; (2) the redistricting guidelines of MCL 3.63(c), as enacted by 1999 PA 211, were not binding on the Legislature's redistricting of Michigan's congressional seats in 2001; and (3) the reference to the 1999 guidelines in the 2001 redistricting act does not indicate an intention by the Legislature to make the redistricting plan reviewable using those guidelines. We therefore deny the application for review of the congressional redistricting plan.

I.  Federal Framework for Congressional Districting

The Constitution provides that representatives in Congress are to be apportioned among the states according to their populations,[1] with the allocation to be made according to the decennial census.[2]  In general, the United States Constitution leaves to the states the manner of electing representatives.  US Const, art I, § 4 provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.

However, the Congress and the federal courts have imposed several limitations on the states' authority in the area of congressional districting.  In a series of decisions, the

---

[1] US Const, Am XIV, § 2.

[2] US Const, art I, § 2.

2

United States Supreme Court has established the primacy of the principle of "one person, one vote." *Wesberry v Sanders*, 376 US 1, 7-8; 84 S Ct 526; 11 L Ed 2d 481 (1964); *Reynolds v Sims*, 377 US 533, 562-564; 84 S Ct 1362; 12 L Ed 2d 506 (1964). That principle requires that congressional districts must be constructed so that "as nearly as practicable one man's vote in a congressional election is . . . worth as much as another's." *Wesberry,* 376 US 7-8. That standard has been refined to require that good-faith efforts be made to achieve precise mathematical equality. *Kirkpatrick v Preisler*, 394 US 526, 530-531; 89 S Ct 1225; 22 L Ed 2d 519 (1969). Thus, to justify any deviation from mathematical equality, it must be demonstrated that the deviation was either unavoidable despite good-faith efforts or was necessary to achieve some legitimate state goal. *Karcher v Daggett*, 462 US 725, 731; 103 S Ct 2653; 77 L Ed 2d 133 (1983).

Second, Congress enacted the voting rights act of 1965,[3] which, among other things, prohibits state election practices or procedures that result in "a denial or abridgement of the right of any citizen of the Untied States to vote on account of race or color . . . ." 42 USC 1973(a). See, generally, *Thornburg v Gingles*, 478 US 30; 106 S Ct 2752; 92 L Ed 2d 25 (1986); *Growe v Emison*, 507 US 25; 113 S Ct 1075; 122 L Ed 2d 388 (1993); *Reno v Bossier Parish Sch Bd*, 520 US 471; 117 S Ct 1491; 137 L Ed 2d 730 (1997): *Beer v United States*, 425 US 130, 141; 96 S Ct 1357; 47 L Ed 2d 629 (1976).

Third, Congress has imposed a requirement for use of

---

[3] PL 89-110, 42 USC 1973 *et seq*.

single-member districts for the election of representatives. 2 USC 2c.

### II.   Recent History of Congressional Redistricting in Michigan

Unlike the constitutions of a number of states,[4] Michigan's Constitution does not include any provisions regarding the procedure or standards for congressional redistricting.[5]  Thus, the Legislature has been free to adopt redistricting plans in any manner it chose, consistent with federal requirements.  However, before 2001 PA 115, the Michigan Legislature last enacted a congressional districting plan in 1964.  1964 PA 282.  The Legislature failed to redistrict the state following the next three censuses, and the federal courts ultimately adopted plans that have been used since 1972.  See *Dunnell v Austin*, 344 F Supp 210 (ED Mich, 1972); *Agerstrand v Austin*, No. 81-50256 (ED Mich, unpublished opinion issued May 20, 1982); *Good v Austin*, 800 F Supp 557 (ED & WD Mich, 1992).

### III.   Michigan Redistricting Legislation

Three Michigan statutes are relevant to the issues raised in this case—1999 PA 221 and 222, passed in anticipation of the redistricting process following the 2000 census, and 2001 PA 115, the redistricting plan at issue in this case.

### A.   1999 PA 221—The Substantive Statute

---

[4] E.g., Ariz Const, art IV, § 1; Cal Const, art XXI, § 1; Mo Const, art III, § 45; Wash Const, art 2, § 43.

[5] Proposals to include such provisions were considered at the Constitutional Convention, but were not adopted.  See 2 Official Record, Constitutional Convention 1961, pp 2392, 2409-2410, 2412-2414.

4

1999 PA 221 provided a legislative process for redistricting congressional seats. It set November 1, 2001,[6] as the deadline for legislative action, MCL 3.62, and then, in MCL 3.63, established standards to be used in drawing districts. MCL 3.63(a) and (b) incorporated the federal constitutional and statutory requirements.[7] In this action, plaintiffs do not claim that the legislative plan fails to comply with those provisions.[8] MCL 3.63(c) then created

---

[6] And every 10 years thereafter.

[7]

Except as otherwise required by federal law for congressional districts in this state, the redistricting plan shall be enacted using only these guidelines in the following order of priority:

(a) The constitutional guideline is that each congressional district shall achieve precise mathematical equality of population in each district.

(b) The federal statutory guidelines in no order of priority are as follows:

(i) Each congressional district shall be entitled to elect a single member.

(ii) Each congressional district shall not violate section 2 of title I of the voting rights act of 1965, Public Law 89-110, 42 USC 1973.

The inclusion of the federal guidelines for districting in MCL 3.63(a), (b) represents an appropriate recognition of the controlling federal law. However, those guidelines derive their force not from the act of the Michigan Legislature, but, rather, from the underlying federal constitutional and statutory provisions.

[8] The parties have informed the Court that an action has been filed by other plaintiffs against the Secretary of State in the United States District Court for the Eastern District of Michigan that does raise federal challenges to the redistricting statute. *O'Lear v Secretary of State*, No. 01-72584. They report that a three-judge panel has been convened and that the district court has denied a motion to expedite the scheduling of a conference, but that no further

5

"secondary" guidelines.  The first priority was contiguity of districts, followed by provisions involving breaking county and municipal lines.  MCL 3.63(c) provides:

> The secondary guidelines in order of priority are as follows:
>
> (i) Each congressional district shall consist of areas of convenient territory contiguous by land. Areas that meet only at points of adjoining corners are not contiguous.
>
> (ii) Congressional district lines shall break as few county boundaries as is reasonably possible.
>
> (iii) If it is necessary to break county lines to achieve equality of population between congressional districts as provided in subdivision (a), the number of people necessary to achieve population equality shall be shifted between the 2 districts affected by the shift.
>
> (iv) Congressional district lines shall break as few city and township boundaries as is reasonably possible.
>
> (v) If it is necessary to break city or township lines to achieve equality of population between congressional districts as provided in subdivision (a), the number of people necessary to achieve population equality shall be shifted between the 2 districts affected by the shift.
>
> (vi) Within a city or township to which there is apportioned more than 1 congressional district, district lines shall be drawn to achieve the maximum compactness possible.
>
> (vii) Compactness shall be determined by circumscribing each district within a circle of minimum radius and measuring the area, not part of the Great Lakes and not part of another state, inside the circle but not inside the district.
>
> (viii) If a discontiguous township island exists within an incorporated city or discontiguous portions of townships are split by an incorporated city, the splitting of the township shall not be considered a split if any of the following circumstances exist:

---

action has been taken in the federal litigation.

(A) The city must be split to achieve equality of population between congressional districts as provided in subdivision (a) and it is practicable to keep the township together within 1 district.

(B) A township island is contained within a whole city and a split of the city would be required to keep the township intact.

(C) The discontiguous portion of a township cannot be included in the same district with another portion of the same township without creating a noncontiguous district.

(ix) Each congressional district shall be numbered in a regular series, beginning with congressional district 1 in the northwest corner of the state and ending with the highest numbered district in the southeast corner of the state.

B.   1999 PA 222—The Procedural Statute

1999 PA 222 created a mechanism for involving this Court in the redistricting process.  MCL 3.71 said that the Supreme Court has exclusive jurisdiction over state claims regarding congressional redistricting:

The supreme court has original and exclusive state jurisdiction to hear and decide all cases and controversies in Michigan's 1 court of justice involving a congressional redistricting plan.  A case or controversy in Michigan's 1 court of justice involving a congressional redistricting plan shall not be commenced in or heard by the state court of appeals or any state trial court. If a case or controversy involves a congressional redistricting plan but an application or petition for review was not filed under section 2 or 3, the supreme court may, but is not obligated to, undertake all or a portion of the procedures described in section 4.

The statute then provided two ways for actions to be brought.  First, MCL 3.72 says that if the Legislature passes a redistricting plan by November 1, 2001, any voter may seek review of the plan:

Upon the application of an elector filed not later than 60 days after the adoption of the enactment of a congressional redistricting plan,

the supreme court, exercising original state jurisdiction may review any congressional redistricting plan enacted by the legislature, and may modify that plan or remand that plan to a special master for further action if the plan fails to comply with the congressional redistricting act.

On the other hand, if the Legislature fails to act by the deadline, under MCL 3.73, a political party or member of the House of Representatives may request this Court to develop a redistricting plan:

> Unless legislation enacting a redistricting plan for congressional districts is approved on or before the deadline established in the congressional redistricting act, a political party, or a member of the United States house of representatives on or after November 2 immediately following the deadline established in the congressional redistricting act, may petition or otherwise file pleadings or papers with the supreme court requesting that the supreme court prepare a redistricting plan for congressional districts in compliance with the redistricting guidelines provided in the congressional redistricting act.

If an action is filed under either of those provisions, MCL 3.74 sets forth procedures to be followed:

> If an application or petition for review is filed in the supreme court under section 2 or 3, the supreme court shall do all of the following:

> (a) Exercising original state jurisdiction or other state jurisdiction pursuant to Michigan court rule 7.301(A)(7) or any successor court rule, undertake the preparation of a redistricting plan for congressional districts.

> (b) Appoint and utilize a special master or masters as the court considers necessary.

> (c) Provide, by order, for the submission of proposed redistricting plans by political parties and other interested persons who have been allowed to intervene. Political parties shall be granted intervention as of right.

> (d) After hearing oral argument or appointing special masters, propose 1 plan for consideration of the parties and the public, and make that plan available for public inspection at least 30 days

before the time set for hearing in subdivision (f).

(e) Prescribe, by order or otherwise, the procedure for and the deadlines pertaining to filing objections and rebuttal to the proposed plan in advance of the hearing scheduled in subdivision (f).

(f) Hold a hearing on the proposed plan at a time determined by the court but not later than March 1 immediately following the deadline established in the congressional redistricting act.

(g) In order to provide for the orderly election process and for candidates to meet statutory deadlines for filing and residency, and after making any revisions to the proposed plan that the supreme court considers necessary, order a redistricting plan for congressional districts not later than April 1 immediately following the deadline established in the congressional redistricting act.

C.    2001 PA 115—The Redistricting Act

Following the release of the 2000 census data and the federal reapportionment of representatives to the states, in June 2001, the Legislature took up the question of districting the fifteen seats allocated to Michigan.  The Senate passed a redistricting plan (SB 546) on June 26, 2001.  During House consideration of the bill, two alternative plans were introduced, but were rejected.[9]

After final action by the Legislature,[10] it adjourned for

---

[9] As one might expect, much of the dispute in the Legislature was over the political "fairness" of the several plans.  In this Court, plaintiffs also argue that the legislatively adopted plan is politically unfair, in the sense of favoring one of the major political parties over the other.  However, at oral argument they concede that such questions of political fairness are not incorporated in the statutory guidelines by which they claim that the plan should be reviewed.

[10] After initial passage of the bill, on July 11 each house approved an amendment correcting omission of several census tracts from the description of the districts.

the summer recess. As the bill was being prepared for submission to the Governor, it was discovered that two census tracts, including 4,578 people, had been omitted from the bill's description of the districts. The Secretary of the Senate (the originating house) corrected the language by inserting the two tracts in the description of District 15 in the enrolled version of the bill that was presented to the Governor. He approved it on September 11, 2001, and it was filed with the Secretary of State on that date.[11]

After the Legislature returned from its recess, on October 17, 2001, another proposed plan, which plaintiffs claim is superior to the 2001 PA 115 plan, was introduced. However, it was never reported out of committee.

## IV. Proceedings in This Case

Plaintiffs filed this action on November 6, 2001, seeking to invoke the procedures set forth in 1999 PA 222. They alleged that 2001 PA 115 was void because the bill signed by the Governor was not the same one passed by the Legislature, and that the act violated the redistricting guidelines of MCL 3.63(c). The named defendants were the Secretary of State and the Director of Elections. On November 29, 2001, we granted the motion to intervene by defendants Anderson, Yentsch, and Van Haitsma.[12] In that order, we directed the filing of briefs and included a number of questions that the

_____

[11] The Legislature did not vote to give the act immediate effect, and thus, under Const 1963, art 4, § 27, it will be effective March 22, 2002.

[12] The plaintiffs and the intervening defendants are individual Michigan voters. However, they are surrogates for the Democratic and Republican parties, respectively.

parties were to address.[13]   The parties appeared for oral argument on January 23, 2002.

---

     (1) Is this action properly brought under MCL 3.72?

     (2) Is review of the congressional redistricting plan by this Court discretionary or compulsory under 1999 PA 222?

     (3) What deference, if any, should this Court give to the redistricting plan adopted by the Legislature?

     (4) Under separation of powers principles set forth in Const 1963, art 3, § 2, may this Court modify or reject the redistricting plan adopted by the Legislature and adopt its own redistricting plan?

     (5) Do the provisions of MCL 3.74, specifying the procedures this Court is to follow in reviewing a congressional redistricting plan, violate Const 1963, art 3, § 2, or art 6, § 5?

     (6) Do the standards of MCL 3.63 apply to review of the redistricting plan adopted in 2001 PA 115?

     (A) If the standards of MCL 3.63 apply, are those standards exclusive?

     (i) If they are exclusive, does the provision of MCL 3.63(c) that the secondary guidelines are "in order of priority" mean that one does not consider a criterion of lower priority unless two plans are equivalent with respect to all of the criteria of higher priority?

     (ii) If they are not exclusive, what other criteria are applicable?

     (B) If the standards of MCL 3.63 do not apply, what criteria should be used to review a redistricting plan?

     (7) How does one define a "break" of a county boundary?

     (8) How does one define a "break" of a city or township boundary?

V. Jurisdiction

Plaintiffs premise the jurisdiction of this Court on MCL 3.71. However, the intervenors argue that the Legislature's attempt to confer jurisdiction on this Court is unconstitutional because the Legislature lacks the authority to extend our jurisdiction by statute. The constitutional provision regarding Supreme Court jurisdiction is Const 1963, art 6, § 4:

> The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court. The supreme court shall not have the power to remove a judge.

The intervenors cite cases decided under the corresponding language of the previous Constitution[14] holding that the Legislature lacks the authority to expand Supreme Court jurisdiction. E.g., *In re Manufacturer's Freight Forwarding Co*, 294 Mich 57, 69; 292 NW 678 (1940).

However, it is unnecessary for us to decide this issue. As even the intervenors concede, Const 1963, art 6, § 4, retains our authority to issue prerogative and remedial writs, such as mandamus. This has been the traditional vehicle for challenging redistricting and apportionment schemes. E.g., *In re Apportionment of the State Legislature—1992*, 439 Mich 715,

_____

[14] Const 1908, art 7, § 4:

> The supreme court shall have a general superintending control over all inferior courts; and shall have power to issue writs of error, habeas corpus, mandamus, quo warranto, procedendo and other original and remedial writs, and to hear and determine the same. In all other cases it shall have appellate jurisdiction only.

12

717; 486 NW2d 639 (1992); *Stenson v Secretary of State*, 308 Mich 48, 51; 13 NW2d 202 (1944). As a general rule, MCR 3.301(A) provides that complaints for mandamus may not be considered by the Supreme Court if a lower court has jurisdiction. However, MCL 3.71 expressly provides that the Court of Appeals and state trial courts do not have jurisdiction of such cases, making an action in this Court appropriate regardless of whether the Legislature's effort to confer jurisdiction on this Court would otherwise be effective.[15]

### VI. Was 2001 PA 115 Validly Enacted?

In keeping with the one-person, one-vote principles, the Legislature sought to minimize the population disparity among districts to the greatest extent possible. In § 4(e)(i) of 2001 PA 115, it said the following about the population of the districts:

> The population of districts 1-9 and 11-15 is 662,563. The population of district 10 is 662,562.

However, after passage of SB 546 by both houses, it was discovered that two census tracts[16] had been omitted from the

---

[15] As explained later, the state statutory guidelines for redistricting found in MCL 3.63(c) are inapplicable. Thus, the procedural provisions that the Legislature included in MCL 3.74 need not be followed, because they are linked to challenges based on those criteria. Instead, this case has been processed under our rules for original actions and the general provisions governing proceedings in this Court, which permit the use of whatever procedure is appropriate in the circumstances. MCR 7.304(E), 7.316(A)(7).

[16] Census Tracts 416200 and 422900 in Pittsfield Township, Washtenaw County.

bill's description of the districts.[17]  Those tracts include 4,578 people.  It is undisputed that totaling the populations of the districts as described in SB 546, Districts 1-14 had the totals specified in § 4(e)(i).  However, the description of District 15 included exactly 4,578 fewer people than the population of the district stated in that section.

The Secretary of the Senate, in reliance on Rule 12 of the Joint Rules of the Senate and House of Representatives,[18] corrected the bill by inserting references to those census tracts in the description of District 15[19] in the enrolled bill that was submitted to the Governor, and that he approved.

Plaintiffs argue that because of these events, 2001 PA 115 was not validly enacted, citing Const 1963, art 4, §§ 1[20]

---

[17] The enrolled bill is forty-two pages long.  Forty-one of those pages consist of descriptions of the districts. Where whole counties, cities, or townships are contained within a district, there is simply a reference to the county, city, or township.  However, where cities or townships are split, the act enumerates the census tracts and blocks within each district.  The bulk of the bill consists of lengthy lists of the census units found within each district.

[18]  That rule includes the following:

> [T]he Secretary of the Senate and Clerk of the House of Representatives, as the case may be, shall correct obvious technical errors in the enrolled bill or resolution, including adjusting totals, misspellings, the omission or redundancy of grammatical articles, cross-references, punctuation, updating bill or resolution titles, capitalization, citation formats, and plural or singular word forms.

[19] There is no dispute that the two tracts are contiguous to the rest of District 15.

[20]

> The legislative power of the State of Michigan is vested in a senate and a house of representatives.

14

and 26.[21]  In addition, this theory implicates Const 1963, art 4, § 33, which provides:

> Every bill passed by the legislature shall be presented to the governor before it becomes law, and the governor shall have 14 days measured in hours and minutes from the time of presentation in which to consider it.  If he approves, he shall within that time sign and file it with the secretary of state and it shall become law.

The parties disagree about whether this was a mere technical error, which came within the language of Joint Rule 12.  However, that is not the question.  The courts do not review claims that actions were taken in violation of a legislative rule.  As we explained in *Anderson v Atwood*, 273 Mich 316, 319; 262 NW 922 (1935):

> Rules of legislative procedure, adopted by the Legislature and not prescribed by the Constitution, may be suspended and action had, even if contrary thereto, will not be reviewed by the courts.[22]

Thus, whether the action by the Secretary of the Senate in correcting the omission of the two census tracts was

---

[21]

> No bill shall become a law without the concurrence of a majority of the members elected to and serving in each house.

[22] See also *State ex rel Spaeth v Meiers*, 403 NW2d 392, 394 (ND, 1987); *Carlton v Grimes*, 237 Iowa 912, 923; 23 NW2d 883 (1946):

> With the exception of the few mandatory provisions noted the Constitution of Iowa has given the General Assembly a free hand in determining its rules of procedure.  Whether either chamber strictly observes these rules or waives or suspends them is a matter entirely within its own control or discretion, so long as it observes the mandatory requirements of the Constitution. If any of these requirements are covered by its rules, such rules must be obeyed, but the observance or nonobservance of its remaining rules is not subject to review by the courts.

authorized by Joint Rule 12 is irrelevant. The question is whether the change violates the constitutional provisions governing the enactment of legislation. If it does, compliance with Joint Rule 12 will not save the statute;[23] if it does not, a violation of the legislative rule is not a basis for finding 2001 PA 115 not to have been validly enacted.[24]

The issue is whether the correction by the Secretary of the Senate was a change that invalidates the statute under the governing constitutional provisions. Plaintiffs rely particularly on language from *Beacon Club v Kalamazoo Co Sheriff*, 332 Mich 412; 52 NW2d 165 (1952). There, through clerical error, the version of the bill initially presented to the Governor omitted from the title a reference to an added section.[25] We said:

> The inclusion of the reference to the added section in the title of the measure here involved was essential to its validity. Its omission in the original draft of the enrolled act was more than a mere clerical error. We think it may be assumed that the legislature considered the section in question as a material part of the bill. As a result of the error in printing, the enrolled act submitted to the governor differed materially *in substance* from the draft of the measure as passed by the legislature. [332 Mich 418 (emphasis in

---

[23] See *United Ins Co v Attorney General*, 300 Mich 200, 206; 1 NW2d 510 (1942).

[24] The flaw in the reasoning of the dissent is that it treats the case as involving review of the Secretary of the Senate's action under Joint Rule 12, discussing at length whether the change made was to correct "obvious technical errors." However, as even the dissent recognizes at the end of that lengthy discussion, the question is "whether the action is proscribed by the constitution."

[25] The bill as passed by both houses of the Legislature had the correct, amended title.

original).]

The facts of *Beacon Club* are quite different from those of this case.[26] The language from that case on which plaintiffs rely merely stands for the generally accepted proposition that a material variation between a bill as enacted by the Legislature and approved by the Governor invalidates the legislation.[27] That begs the question presented here—whether the addition of the two inadvertently omitted census tracts constitutes a material change in the bill.

On several occasions we have permitted correction of discrepancies in statutes where the legislative intent was

---

[26] The Governor returned the bill to the House of Representatives with a message indicating that he had not signed it because of doubts about the constitutionality of the added section. The Clerk of the House then determined that the amended title had been inadvertently omitted and had a correct version printed, which was returned to the Governor, who signed it.

The issue in *Beacon Club* was whether the Governor's initial return of the document to the House precluded the Clerk from resubmitting the corrected bill. This Court concluded that the previous submission of the incorrect bill was a nullity and that the legislation should not be invalidated on the basis of an error that was properly corrected.

[27] For example, in *Rode v Phelps*, 80 Mich 598; 45 NW 493 (1890), significant amendments of the bill, originally approved by the Senate, but deleted as a result of conference committee action and subsequent passage by both houses, were nonetheless included in the bill as signed by the Governor. We held that the bill was not validly enacted. See also *Foster v Naftalin*, 246 Minn 181; 74 NW2d 249 (1956); *Kenyon v Kansas Power & Light Co*, 254 Kan 287; 864 P2d 1161 (1993).

The corollary of that principle is that immaterial errors can be corrected without invalidating the enactment. E.g., *Application of Fisher*, 80 NJ Super 523, 527-528; 194 A2d 353 (1963), and *Childers v Couey*, 348 So 2d 1349, 1351 (Ala, 1977).

clear.  For example, in *People ex rel Gale v Supervisor of Onondaga*, 16 Mich 254 (1867), the title of the bill as enacted by the Legislature referred to the levying and collecting of a "bounty" tax in the Township of Onondaga.  After passage, through a clerical error, the word "county" was substituted for "bounty," and the bill was signed by the Governor with that mistake.  We rejected the argument that the discrepancy invalidated the bill, because it was not a mistake that could mislead anyone who read the act.  16 Mich 258.

In this case, plaintiffs concede that the Legislature intended to include the two census tracts in District 15. That conclusion is inescapable given the undisputed population of the tracts and the population of the districts stated in 2001 PA 115.[28]  In that sense, the case is like *Michigan State Prison Bd of Control v Auditor General*, 149 Mich 386; 112 NW 1017 (1907).  There, a bill appropriated

> the sum of one hundred seventy-five thousand dollars for the purpose of carrying out the provisions of this act: *Provided*, That of the one hundred seventy-five [thousand] dollars so appropriated fifty thousand dollars is hereby appropriated for the purpose of purchasing, erecting and equipping the necessary buildings, machinery, boilers and equipment to be used in the manufacturer of twine and cordage, together with a warehouse at the State prison at Jackson, Michigan,

_____

[28] As explained earlier, the question is not whether the Secretary of the Senate's action was authorized by Joint Rule 12.  However, even if one analyzes the issues from that viewpoint, the dissent can hardly be taken seriously in its claim that the correction of the bill at issue by the Secretary of the Senate under Senate Rule 12 was nontechnical and did not involve adjusting totals.  The simple reason is that § 4(e)(i) of 2001 PA 115 states the exact population for each district.  District 15 was, in short, the only place to which these census tracts could have been allocated in order to meet the constitutional population requirements.  The plaintiffs themselves acknowledged as much at oral argument.

and the remaining sum of one hundred twenty-five thousand dollars is hereby appropriated to constitute a "revolving fund" to be disposed of in such manner as herein provided. [149 Mich 387-388.]

The word "thousand" in brackets was not in the bill as enrolled and signed by the Governor, but was contained in the bill as passed by both houses of the Legislature.[29] As in the instant case, we found the mathematical equivalence of the numbers to allow correction of the bill:

It is perfectly manifest that the legislature by this proviso appropriated $50,000 for the purpose of purchasing, erecting, and equipping the necessary buildings, and it is equally obvious that that $50,000 could not be subtracted from $175, and that the $175 was plainly intended to mean $175,000 is again made manifest by the fact that in the same clause after appropriating $50,000 the legislature further appropriated a *remaining* $125,000 which must be a remainder after deducting $50,000 from $175,000. It is a clerical error which corrects itself and leaves nothing doubtful. Such clerical errors will not be permitted to defect the plain intent of the legislature. [149 Mich 388 (emphasis in original).]

Plaintiffs' response is that this principle does not apply because one must look beyond the face of 2001 PA 115 to identify the correct placement of the census tracts. That is, because the act itself does not include the population figures

---

[29] The dissent attempts to extract from *Board of Control* the principle that the only corrections that can be made are those that "(1) are not essential to the substance of the bill and (2) mislead no one." However, some errors are such that, if uncorrected, they would render a bill internally incoherent and illogical. Where the intent is clear, such clerical errors can be corrected. *Board of Control* itself is a good example. The word "thousand" can certainly be said to be essential to the substance of the bill: without its insertion, the appropriation intended by the Legislature could not have been implemented. The point is that, from the context, it was clear that the word was meant to be included, just as it is clear in this case that the two census tracts were intended to be included in District 15.

19

for each census tract, one must resort to external sources to find that data.[30]  However, the need to resort to census data does not invalidate the statute.  The information that one must examine is the official government data that are required to be used in congressional redistricting, of which judicial notice may be taken under MRE 201.[31]  Further, we have allowed correction of errors in the text of statutes to reflect the actual legislative intent, even where that required resort to sources outside the face of the statute itself.  In *Stow v Grand Rapids*, 79 Mich 595, 597; 44 NW 1047 (1890), we examined several other statutes to ascertain the Legislature's intention in the reference to a local act in the title of the statute in question.

We therefore conclude that the correction of SB 546 by the Secretary of the Senate to include the two omitted census tracts in District 15 implemented the clear intent of the Legislature that the tracts be included in that district and does not invalidate the statute.[32]

---

[30] As noted, § 4(e)(i) does include the total population of each district.

[31] See, e.g., *Goins v Allgood*, 391 F2d 692, 697 (CA 5, 1968); *Barnett v Daley*, 32 F3d 1196, 1198 (CA 7, 1994).

[32] We have located only one other case in which the question of invalidating a legislative redistricting plan has arisen because of omission of a portion of the population from any district.  In *Harris v Shanahan*, 192 Kan 183; 387 P2d 771 (1963), the legislature passed a bill apportioning the state senate, but, through clerical error, the version of the bill presented to the governor and signed did not include a city (with approximately 8,800 people) in any district.  The Kansas Supreme Court declined to insert a reference to the city in the district in which the legislature apparently intended to include it.

Without commenting on the correctness of the *Harris*

20

## VII. Applicability of 1999 Redistricting Guidelines

As set forth above, 1999 PA 221 included guidelines for future congressional redistricting plans. Similarly, the procedural provisions of 1999 PA 222 purport to direct us to review any enacted redistricting plan for compliance with those guidelines.

Plaintiffs claim that 2001 PA 115 must be struck down because it does not comply with the secondary guidelines of MCL 3.63(c). Particularly, plaintiffs assert that it does not break as few county boundaries as is "reasonably possible." They argue that the alternative plans introduced in the Legislature in July and October 2001 better meet the "county break" criterion, establishing the invalidity of the legislatively adopted plan. However, we need not reach the question of 2001 PA 115's compliance with those secondary guidelines, because we find that the MCL 3.63(c) guidelines are not applicable.

It is a fundamental principle that one Legislature cannot bind a future Legislature or limit its power to amend or repeal statutes. Absent the creation of contract rights, the

---

decision under Kansas law, we note that it lacks a critical feature that is present in this case. In the Kansas case, state legislative districts were being apportioned, which do not require the exactness of population equality that must be used in congressional redistricting. The Kansas plan apparently had districts that ranged approximately ten percent above or below the average population figure. 192 Kan 189. Thus, it would have been possible to place the omitted city and its approximately 8,800 people in one of several districts. By contrast, in this case, the exact correspondence of the population of the omitted census tracts with the population deficit of District 15 makes inescapable the conclusion that the Legislature intended to place those tracts in that district.

later Legislature is free to amend or repeal existing statutory provisions. See *Detroit v Detroit & Howell Plank Rd Co*, 43 Mich 140, 145; 5 NW 275 (1880); *Stone v Mississippi*, 101 US 814, 816-818; 25 L Ed 1079 (1879). As we explained in *Atlas v Wayne Co Bd of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937):

> The act of one legislative body does not tie the hands of future legislatures. *Cooper, Wells & Co v City of St Joseph*, 232 Mich 255 [205 NW 86 (1925)]. The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors. . . . One legislature cannot enact irrepealable legislation or limit or restrict its own power, or the power of its successors, as to the repeal of statutes; and an act of one legislature is not binding on, and does not tie the hands of, future legislatures.

We recently reiterated this principle in *Ballard v Ypsilanti Twp*, 457 Mich 564, 569; 577 NW2d 890 (1998):

> [T]he Legislature, in enacting a law, cannot bind future Legislatures. *Malcolm v East Detroit*, 437 Mich 132, 139; 468 NW2d 479 (1991); citing *Harsha v Detroit*, 261 Mich 586; 246 NW 849 (1933).

Thus, as even plaintiffs concede, the 2001 Legislature was not bound to follow the guidelines in MCL 3.63(c) adopted by the 1999 Legislature. It could repeal, amend, or ignore them, as it pleased.

However, plaintiffs rely on § 4(a) of 2001 PA 115, which they believe constitutes an incorporation of the 1999 standards in the 2001 districting act:

> In adopting the redistricting plan for congressional districts, it is the intention of the legislature to comply fully with section 3 of the congressional redistricting act, 1999 PA 221, MCL

22

3.63.

The paramount rule of statutory interpretation is to give effect to the intent of the Legislature. *Tryc v Michigan Veterans' Facility,* 451 Mich 129, 135; 545 NW2d 642 (1996). We begin with the language of the statute itself, *In re MCI Telecommunications Complaint,* 460 Mich 396, 411; 596 NW2d 164 (1999), and also consider the context in which the language is used, *Crowe v Detroit*, 465 Mich 1, 6-7; 631 NW2d 293 (2001).

The parties have not cited any authority relevant to interpreting an unusual statutory provision such as this one, in which it is essentially claimed that the substantive provisions of a statute may be challenged on the ground that they fail to meet standards set by the statute itself. In our view, § 4(a) does not incorporate the 1999 guidelines as an enforceable provision of 2001 PA 115 that would permit review of the redistricting plan adopted by that statute.[33] Rather, § 4(a) is merely part of the Legislature's explanation of the principles it used in developing the plan. This interpretation is reinforced by the remainder of § 4, which contains a number of such explanatory provisions that in no sense could create bases for challenges to the redistricting plan. In its entirely, § 4 reads:

> All of the following apply to the redistricting plan in section 1:
>
> (a) In adopting the redistricting plan for congressional districts, it is the intention of the legislature to comply fully with section 3 of the

---

[33] Significantly, neither 2001 PA 115 nor House Concurrent Resolution 34, which further explains SB 546, makes any reference to review of the plan by this Court or to 1999 PA 222.

23

congressional redistricting act, 1999 PA 221, MCL 3.63.

(b) The number of county breaks in the redistricting plan is determined by the following principles:

(i) Breaking a county line means assigning part of the population of a county to 1 or more counties in the formation of a district.

(ii) If population is shifted from a county to a single election district, including a district from 2 geographically-separate areas, there is 1 break. Except as provided in subparagraph (iii), if population from a county is shifted to 2 or more election districts, there are 2 or more breaks.

(iii) If 1 part of a county is shifted to a district and the rest of the county is shifted to another district, there is 1 break.

(c) The redistricting plan was designed to comply fully with both section 2 of the voting rights act of 1965, Public Law 89-110, 42 USC 1973, and the requirements of the equal protection clause of amendment XIV of the constitution of the United States, as set forth in Shaw v Reno, 509 US 630 (1993), and subsequent cases concerning racial gerrymandering. In light of these dual obligations, the plan avoids any practice or district lines that result in the denial of any racial or ethnic group's equal opportunity to elect a representative of its choice and, at the same time, does not subordinate traditional redistricting principles for the purpose of accomplishing a racial gerrymander or creating a majority-minority district. As a consequence, the plan does not result in retrogression or dilution of minority voting strength, particularly in light of the demographic limitations caused by relative population losses and the neutral criteria set forth in section 3 of the congressional redistricting act, 1999 PA 221, MCL 3.63. However, the plan does not sacrifice traditional neutral principles, such as, most importantly, preservation of county and municipal boundaries, for the purpose of engaging in a gerrymander that unnecessarily favors 1 racial group over others.

(d) The plan furthers the underlying purpose of the state constitution of 1963 by facilitating effective representation in the legislature where elected representatives can advance the shared interests of unified municipalities or counties. It does so without sacrificing voting rights act of

24

1965 principles, equal electoral opportunities, or racial fairness.

     (e) The redistricting plan for congressional districts consists of 15 single member districts comprised of convenient territories contiguous by land. All of the following apply to the plan:

     (i) The population in each of districts 1-9 and 11-15 is 662,563. The population of district 10 is 662,562.

     (ii) The number of breaks in county boundaries is 11.

     (iii) The number of breaks in city and township lines is 14.

     (iv) No congressional district is wholly contained within a city.

For example, if the population totals in § 4(e)(i) turned out to be wrong, that would not be a basis for overturning the redistricting plan. Rather, the question would be whether the plan itself meets the federal equal population requirement.

Thus, in context, § 4(a) of 2001 PA 115 constitutes the Legislature's announcement of its conclusion that the redistricting plan it was adopting is in compliance with all applicable guidelines for redistricting.

Election redistricting is principally a legislative function.[34] Legislative action is entitled to great deference in such matters, and the courts should only intervene when the Legislature has failed to perform its function in a constitutional manner.[35] The Legislature was not bound to

---

[34] *Gaffney v Cummings*, 412 US 735, 749; 93 S Ct 2321; 37 L Ed 2d 298 (1973); *Cotlow v Growe*, 622 NW2d 561 (Minn, 2001).

[35] *Wise v Lipscomb*, 437 US 535, 539-540; 98 S Ct 2493; 57 L Ed 2d 411 (1978); *Wesch v Hunt*, 785 F Supp 1491, 1497 (SD Ala, 1992), aff'd 504 US 902; 112 S Ct 1926; 118 L Ed 2d 535 (1992); *State ex rel Lockert v Crowell*, 631 SW2d 702, 706 (Tenn, 1982)

follow MCL 3.63(c).  It was, of course, free to consider those principles that have been historically used by courts in cases of legislative impasse.[36]  However, its choice to consider those principles does not signal an intention to convert the nonbinding guidelines into a rigid test under which the plan can be challenged by anyone who claims that some other plan better meets the guidelines.

## VIII.  Conclusion

Congressional redistricting is primarily a function of the Legislature.  Its exercise of that power can be challenged on the basis of federal requirements for congressional redistricting, which derive their authority from the underlying federal constitutional and statutory provisions, rather than the Michigan Legislature's references to them. However, in this litigation, plaintiffs do not allege that the redistricting plan adopted by 2001 PA 115 fails in any respect to comply with applicable federal guidelines.  Whether the statute was validly enacted is a question that can be raised as a challenge under the Michigan Constitution, but, on the facts of this case, the correction of the enrolled bill before submission to the Governor does not invalidate the statute. The redistricting guidelines in 1999 PA 221 were not binding on the Legislature in adopting the 2001 redistricting plan, and its reference to MCL 3.63(c) does not incorporate those guidelines into 2001 PA 115 so as to create a basis for challenging the plan.  Accordingly, the application for review

---

[36] See, e.g., *Good v Austin*, *supra,* 800 F Supp 563; *In re Apportionment of State Legislature—1982*, 413 Mich 96, 140-142; 321 NW2d 565 (1982).

26

of the redistricting plan is denied.

CORRIGAN, C.J., and WEAVER, TAYLOR, YOUNG, and MARKMAN, JJ., concurred.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

DAVID LeROUX, MICHAEL GRAY,
and ROBERT L. ELLIS,

    Plaintiffs,

v                                                                    No. 120338

SECRETARY OF STATE and
DIRECTOR OF ELECTIONS,

    Defendants,

SUZANNE L. ANDERSON, SHARON
YENTSCH, and BRADLEY VAN HAITSMA,

    Intervening Defendants.
_____

CAVANAGH, J. (*concurring*).

    As the arguments by the majority and the very able
dissent demonstrate, it is a close question whether the
variance between the bill as passed by the Legislature and as
approved by the Governor is sufficiently great to prevent 2001
PA 115 from having been validly enacted.  In a sense, as the
dissent notes, the variance is an important one, because
inclusion of the two omitted census tracts is essential to the
constitutionality of the districting plan.  On the other hand,
the intent that these two tracts be included in District 15 is
clear, given that their inclusion makes the populations of the

districts correspond exactly to those stated in § 4(e)(i) of the bill.

The majority correctly notes that redistricting is primarily a legislative function, and the courts are extremely reluctant to intervene in the process. Where we have become involved in the past, it was because the Legislature and Governor failed to adopt apportionment plans, and, even as we developed plans in order to provide for the continuity of government by ensuring that a constitutionally apportioned Legislature could be elected, we have given them every opportunity to act. See *In re Apportionment of the State Legislature—1992*, 439 Mich 715, 722, 724; 486 NW2d 639 (1992); *In re Apportionment of State Legislature—1982*, 413 Mich 96, 142; 321 NW2d 565(1982).

In recognition of the inappropriateness of judicial intervention into the redistricting process, the disruption that would occur in the upcoming election if the matter were to be returned to the Legislature for reenactment of the plan, with a return trip to this Court a very real probability, and the fact that the correction of the bill by the Secretary of the Senate conformed the bill to the clear intention of the Legislature, I concur in the result reached by the majority.

# STATE OF MICHIGAN

## SUPREME COURT

DAVID LeROUX, MICHAEL GRAY,
and ROBERT L. ELLIS,

    Plaintiffs,

v

SECRETARY OF STATE and
DIRECTOR OF ELECTIONS,

    Defendants,

SUZANNE L. ANDERSON, SHARON
YENTSCH, and BRADLEY VAN HAITSMA,

    Intervening Defendants.

No. 120338

_____

KELLY, J. (*dissenting*).

Public Act 115 of 2001 suffers from fatal flaws inflicted on it by the Secretary of the Senate. As a consequence of her actions, the bill presented to and signed by the Governor was never voted on by the Legislature. Hence, it violated the Michigan Constitution and cannot become law. In addition, the bill that the Legislature passed was never submitted to the Governor. Hence, it too violated the constitution and never became law.

The majority's finding that the addition of two census tracts by the Secretary of the Senate was permissible is erroneous. The legal issue regarding it is not accurately stated in the per curiam opinion. It is not a question whether the Court will review the Legislature's violation of

its own rules.  Rather, it is a question whether, in violating the Legislature's rules, the Secretary of the Senate exceeded her authority and violated the state constitution.

I would hold that the additions rendered the act invalid. The Legislature should be instructed to pass a new act, following the precepts laid down in the Michigan Constitution. It is for the Legislature, not this Court and not the Secretary of the Senate, to fashion the bill so as to be legally valid.

## The Background

The enrolled bill that the Legislature passed, 2001 PA 115, describes which state governmental units are to be within which congressional districts.  The act refines the description where a county or a municipality is split, explicitly stating which census tracts and census blocks belong in which district.[1]

The Senate passed the bill and sent it to the House of Representatives.  The House amended and passed the bill, but later that day, recalled it to make five additions.[2]  2001 Journal of the House 1575.  The House passed the amended bill

---

[1] For example, the description of the Second Congressional District begins as follows:

```
DISTRICT 02
     Allegan County (part)
         Dorr twp (part)
             TRACT 030401 including block(s)
                  1006, 1007, 1008, 1009 . . . .
```

[2] It was discovered that five census tracts had not been included.  The procedure used to insert them is the one that should have been used for the two tracts in question here.

and the Senate concurred in the amendment.  The Senate ordered the bill enrolled.

After the House and the Senate adjourned, the Secretary of the Senate added two additional census tracts to the enrolled bill.[3]  The two tracts contain 4,578 persons. Therefore, the bill the Governor signed allocated 4,578 persons in two census tracts to a congressional district the constituency of which had not been approved by the Legislature.

## "Obvious Technical Errors"

Defendants and intervenors defend the action of the Secretary of the Senate, arguing that Rule 12 of the Joint Rules of the Senate and House of Representatives permitted it. That rule states that the Secretary shall correct "obvious technical errors."

> [T]he Secretary of the Senate and Clerk of the House of Representatives, as the case may be, shall correct obvious technical errors in the enrolled bill or resolution, including adjusting totals, misspellings, the omission or redundancy of grammatical articles, cross-references, punctuation, updating bill or resolution titles, capitalization, citation formats, and plural or singular word forms.

However, by no stretch of logic did the addition here involve an obvious technical error.  First, the error is not in the nature of those listed in the rule.  Where, as in Rule 12, the Legislature describes a concept by using a general

---

[3] The two census tracts are 416200 and 422900.  At oral argument, the intervening defendants informed us that these tracts lie between Districts 7 and 15.  The plaintiffs have not agreed that these tracts belong where the Secretary of the Senate placed them.

term followed by specific examples, this Court applies the rule of statutory construction called "ejusdem generis." *Huggett v Dep't of Natural Resources*, 464 Mich 711, 718; 629 NW2d 915 (2001).

Under ejusdem generis, general terms are interpreted to include only items that are "of the same kind, class, character, or nature as those specifically enumerated." *Id*. at 718-719. Here the general term is "obvious technical errors." The specific terms describe minor, nonsubstantive clerical or grammatical errors. While more errors than those specified are envisioned, when ejusdem generis is applied, they should include solely errors of the same class as those that are listed.

The omission of census tracts does not involve a misspelling, a grammatical article, punctuation, a title, capitalization, citation format, or plural or singular word forms. It does not involve adjusting totals. It should be noted that the bill fails to contain a number representing the population in each listed census tract. Hence, one cannot tabulate the total population in any district by totaling the population of each tract appearing there. Presumably if, as defendants assert, 4,578 people were missing from District 15, one could have ascertained that fact if the tracts listed had included a number representing the population in each. However, even then, one could not have ascertained from the face of the bill that the missing tracts were 416200 and 422900. Therefore, the error does not involve cross references, either.

What it does involve is the utter omission of vital, substantive information. This is an error of a different kind and class from the "obvious technical errors" listed in Rule 12.

Second, not only does the error here not pass legal scrutiny as an obvious technical error, it does not pass a plain language reading either. "Obvious" means "easily seen, recognized, or understood; open to view or knowledge . . . lacking in subtlety." *Random House College Dictionary* (1988). A perusal of the bill as passed would never reveal that the tracts in question were missing. Documents outside the bill would have to be consulted to show it. Hence, as the error is not open to view or lacking in subtlety, it is not "obvious" in the commonly understood meaning of the word.

Defendants argue that the error was obvious because the total population in all the tracts intended for District 15 was listed in the act, 662,563 persons. They consider the error obvious because one can discover it by (1) consulting documents showing the number of people in each of District 15's census tracts, figures not listed in the bill, then (2) totaling them to determine if they reach 662,563. If they do not, one knows that an error was made.

This argument confuses what is obvious with what is ascertainable. One must consult the census data for one county, eight cities, eight townships, and fifty-one census tracts to learn that the population figure stated in the bill for District 15 is not met. Once that has been completed, one knows only that an error has been made. It could be that the

5

Legislature miscalculated the total population in District 15. It could be that one or more tracts are missing. One could then search and compare against the bill lists of thousands of tracts to determine whether certain tracts are not included and which ones they are. Hence, even if the Court could ascertain that tracts 416200 and 422900 belong in District 15, it can scarcely be said that the mistake is an "obvious" technical error.

*ANDERSON* v *ATWOOD* DISTINGUISHED

The majority cites *Anderson v Atwood*[4] for the proposition that this Court will not review the Legislature's failure to comply with its own rules of procedure. It is true that in *Anderson* we did not order recognition of an act that died after the Legislature withdrew it from the Governor. However, *Anderson* is inapposite to the case before us.

Here, the bill did not die because of an alleged violation of the rules. Rather, Rule 12 was used to alter the enrolled bill without the approval of the Legislature. As a consequence of the distinctly differing facts in the two cases, the legal question in this case is quite different. It is whether either a legislative rule or the constitution authorizes the Secretary of the Senate to add to an enrolled bill vital, substantive  information not ascertainable from the bill that the Legislature omitted.

*Anderson* does not stand for the proposition that this Court will not review an action taken under a rule of

---

[4] **273 Mich 316; 262 NW 922 (1935).**

legislative procedure when the action is proscribed by the constitution.  The addition of substantive items to the bill in question by the Secretary of the Senate was an action proscribed by the constitution.

### THE APPLICABILITY OF ART 4, § 33 OF THE CONSTITUTION

The Michigan Constitution provides that no bill becomes law without the consent of a majority of the members elected to and serving in each house.  Const 1963, art 4, § 26.  It also provides that every bill passed by the Legislature must be presented to the Governor before it becomes law.  Const 1963, art 4, § 33.  It follows that, since the bill presented to the Governor in this case was not the one passed by the Legislature, the constitution was violated.

The majority finds that the changes made in the enrolled bill were technicalities; hence, they did not substantially alter the bill passed by the Legislature.  The precedent of this Court does not support that finding.  Rather, it establishes that the only changes permissible in the text of a bill between passage and submission to the Governor are the addition of words that (1) are not essential to the substance of the bill and (2) mislead no one. *Michigan State Prison Bd of Control v Auditor General*, 149 Mich 386; 112 NW 1017 (1907).[5]

---

[5] In *Board of Control* the enrolled bill accidentally left out the word "thousand" in one place when designating $175,000 for the construction of a binder-twine plant at Jackson prison.  The bill passed by the Legislature correctly cited the amount.  This Court found the omission to be unsubstantial because the word "thousand" was nonessential.  It was clear
(continued...)

7

As has been demonstrated herein, the addition of two census tracts was essential to the substance of the bill. It is without contest that, without the addition, District 15 was incomplete and 4,578 people were left without a congressional district. Also, the addition is misleading. It causes one to believe that the Legislature intended the tracts to be in District 15. The truth appears to be that the Legislature had no position with respect to these tracts. It simply overlooked them.

A holding that the action of the Secretary of the Senate was unconstitutional would be in accord with our decision in *Rode v Phelps*[6] where we observed, relative to the role of the Legislature in lawmaking:

> The people speak, in the enactment of laws, through the Legislature, acting within the limits of the Constitution; and any holding which would authorize or permit laws, or any part of any law, to be ordained or created in any other way, would be inconsistent with the logic of our free institutions, and dangerous to the safety and security of the liberties of the people.

It would be consistent, also, with our holding in *Stow v Grand Rapids*, 79 Mich 595; 44 NW 1047 (1890). In that case, we ruled that the inclusion of immediate effect by the Clerk of

---

[5] (...continued)
from the text of the bill that the intent of the Legislature was to appropriate $175,000.

By contrast, it is not clear from the text of the bill here that the Legislature intended any more tracts to be included in District 15, much less which tracts. It can only be hypothesized after prolonged study of census data. That is why *Board of Control* does not support the majority's argument, but instead cuts against it.

[6] 80 Mich 598, 609; 45 NW 493 (1890).

the House of Representatives was an unconstitutional addition to the bill passed by the Legislature.

This state has no case law allowing the addition of substantive items to a bill between passage and submission to the Governor. What has been found to be nonsubstantive, by contrast, has been the *omission* of a word in an enrolled bill when the omission is obvious on the bill's face. *Board of Control*, *supra*. Also nonsubstantative was the second alleged error in the bill in *Stow*, *supra,* because it involved a typographical error wrongly describing the act to be amended as an act from 1887, instead of 1877.

The majority's use of these cases to justify the addition of substantive items like a census tract permits the Secretary of the Senate to engage in fact finding to determine legislative intent. It permits that individual to speak for the Legislature in a manner never before permitted in Michigan. The designation of voting districts is a legislative decision. *Williams v Secretary of State*, 145 Mich 447; 108 NW 749 (1906). It cannot be a mere technical correction for the secretary to add 4,578 people to a congressional district.

The case most nearly on point with the one before us was decided by the Supreme Court of Kansas. *Harris* v *Shanahan*, 192 Kan 183; 387 P2d 771 (1963). It involved apportionment of the Kansas Legislature. The bill submitted to the governor omitted a city of 8,800 people from any senatorial district.

The Kansas court rejected arguments that the omission was technical and that the court should correct it to prevent

constitutional error. In so ruling, it observed

> We assume that the intention of both houses of the legislature and of the governor was to enact a law which gave adequate senatorial representation to every citizen of Kansas, including the residents of the city of Leawood. No one questions that fact. But we are confronted with what was done, not what the legislature may have really intended to do. [*Id*. at 786.]

In *Harris*, as here, the bill passed by both houses of the legislature was not the bill submitted to and signed by the governor. The Kansas court found that the defect was one that the legislature alone could correct.

Since the bill submitted to the Governor in the case before us contained substantive, not technical, additions, it was not the bill passed by the Legislature. And since the bill passed by the Legislature was never submitted to the Governor, art 4, § 33 of the Michigan Constitution was violated.

## CONCLUSION

I would hold the Secretary of the Senate's modification invalid because it violates legislative Rule 12 and, most significantly, it violates the Michigan Constitution. Adding tracts to the description of a legislative district is both a substantive provision and it is misleading. A fair reading of Rule 12 based on plain meaning or a statutory construction using ejusdem generis will not permit us to construe the omission as an obvious technical error. The secretary's change made a substantive alteration to the reapportionment bill. As a consequence, the bill passed by the Legislature was not submitted to the Governor, a violation of the Michigan

10

Constitution. The bill that was passed was never submitted to the Governor. Hence it never became law.

The majority chooses to pass off as nonserious my conclusion that the Secretary of the Senate's changes to the bill were substantive and not a mere adjustment of totals. However, it does seem serious to me (1) that 4,578 persons were added to a congressional district without a vote, or even the knowledge, of the Legislature, (2) that no figures can be found in this bill that, by any method, can be totaled or retotalled to assure us that 4,578 people are or are not missing from District 15, and (3) that no Michigan case law has ever condoned such a significant and unorthodox amendment to a legislative bill as the majority has approved here.

To remedy this troubling situation, the Court should avoid legislating. Rather, it should afford the Legislature the opportunity to heed its constitutional mandate to reapportion in accordance with art 4, § 33 of the Michigan Constitution.

If there is to be a judicial determination of congressional reapportionment, it should occur only after the Legislature has shown itself unable to perform its constitutional duty to reapportion.

After remand, should the Legislature be unable to pass a valid reapportionment bill and give it immediate effect, it may return to this Court, seeking further and timely relief.[7]

---

[7] See *Reynolds v Sims*, 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964); *California **Assembly v Deukmejian**, 30 Cal 3d (continued...)

11

Because of the increasingly short timetable involved in preparing for the congressional elections, this Court should retain jurisdiction of the matter.

It is regrettable that an error on the part of the Secretary of the Senate should defeat the action of the Legislature. This is especially true as the congressional reapportionment law is of great public importance. However, my strict application of the law calling for full compliance with constitutional requirements is, taking the long view, a sound one and in the interest of good government.

---

[7] (...continued)
638; 180 Cal Rptr 297; 639 P2d 939 (1982).