**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 28, 2005**

ALBERTA STUDIER, PATRICIA M.
SANOCKI, MARY A. NICHOLS, LAVIVA
M. CABAY, MARY L. WOODRING, and
MILDRED E. WEDELL,

    Plaintiffs-Appellants,

v                             No. 125765

MICHIGAN PUBLIC SCHOOL EMPLOYEES'
RETIREMENT BOARD, MICHIGAN PUBLIC
SCHOOL EMPLOYEES' RETIREMENT SYSTEM,
DEPARTMENT OF MANAGEMENT AND BUDGET,
and TREASURER OF MICHIGAN,

    Defendants-Appellees.
_____/

ALBERTA STUDIER, PATRICIA M.
SANOCKI, MARY A. NICHOLS, LAVIVA
M. CABAY, MARY L. WOODRING, and
MILDRED E. WEDELL,

    Plaintiffs-Appellees,

v                             No. 125766

MICHIGAN PUBLIC SCHOOL EMLOYEES'
RETIREMENT BOARD, MICHIGAN PUBLIC
SCHOOL EMPLOYEES' RETIREMENT SYSTEM,
DEPARTMENT OF MANAGEMENT AND BUDGET,
and TREASURER OF MICHIGAN,

    Defendants-Appellants.
_____/

BEFORE THE ENTIRE BENCH

TAYLOR, C.J.

We granted leave in this case to consider two issues. The first is whether health care benefits paid to public school retirees constitute "accrued financial benefits" subject to protection from diminishment or impairment by Const 1963, art 9, § 24. We hold that they do not and, accordingly, affirm the Court of Appeals determination on this issue.[1] The second issue is whether the statute establishing the health care benefits, MCL 38.1391(1), created a contract with the public school retirees that could not be changed by a later legislature because to do so would unconstitutionally impair an existing contractual obligation in violation of US Const, art I, § 10 and Const 1963, art 1, § 10. The Court of Appeals determined that MCL 38.1391(1) established a contract, but that the Legislature's subsequent changes were insubstantial and, thus, there was no constitutionally impermissible impairment of contract. The Court of Appeals erred on this issue because MCL 38.1391(1) did not create a contract. However, because the Court of Appeals reached the correct result, we affirm its determination that the circuit court properly entered summary disposition in defendants' favor.

---

[1] 260 Mich App 460; 679 NW2d 88 (2004).

## I. FACTUAL HISTORY AND PROCEDURAL POSTURE

The Michigan Public School Employees' Retirement Board (board) began providing a health care plan for public school retirees in 1975 pursuant to amendments made by 1974 PA 244 to the former Public School Employees Retirement Act, 1945 PA 136, which was the predecessor of the current Public School Employees Retirement Act, 1980 PA 300, MCL 38.1301 *et seq*. Since that time, participants in the plan have been required to pay deductibles and copays for prescription drugs, and the amounts of the deductibles and copays have gradually increased throughout the years because of numerous amendments the board has made to the plan to reflect the rising costs of health care and advances in medical technology. The present case arises from the two most recent amendments made to the plan by the board. The first amendment became effective on January 1, 2000, and increased the amount of the deductibles that retirees are required to pay. The second amendment occurred on January 21, 2000, and increased the copays and out-of-pocket maximums that retirees are required to pay for prescription drugs. The Court of Appeals succinctly summarized those amendments as follows:

> The amendments modified the plan's prescription drug copayment structure and out-of-pocket maximum for prescription drugs effective April 1, 2000, and also implemented a formulary effective January 1, 2001. A formulary is a

3

preferred list of drugs approved by the federal Food and Drug Administration that is designed to give preference to those competing drugs that offer the greatest therapeutic benefit at the most favorable cost. Existing maintenance prescriptions outside the formulary were grandfathered in and subject only to the standard copayment of twenty percent of the drug's cost, with a $ 4 minimum and a $ 20 maximum.

The prescription drug copayment was changed to a twenty percent copay, with a $4 minimum and $20 maximum for up to a one-month supply. The copay maximum for mail-order prescription copayment was set at $50 for a three-month supply. A $750 maximum out-of-pocket copay for each calendar year was also established. [The plan did not previously contain an annual out-of-pocket maximum.] Under the formulary, eligible persons pay an additional twenty percent of a new nonformulary drug's approved cost only when use of the nonformulary drug is not preapproved by the drug plan administrator.

The board also adopted a resolution to increase health insurance deductibles from $145 for an individual to $165, and from $290 to $ 330 for a family, effective January 1, 2000. The deductibles do not apply to prescription drugs.[2]

Plaintiffs, six public school retirees, filed suit for declaratory and injunctive relief against the board, the Michigan Public School Employees' Retirement System (MPSERS), the Michigan Department of Management and Budget, and the Treasurer of the state of Michigan. Although plaintiffs' complaint contained three counts, only counts I and II remain for our consideration. Count I alleged that the copay and deductible increases violate Const 1963, art

---

[2] 260 Mich App at 466-467.

4

9, § 24, which prohibits the state or a political subdivision from diminishing or impairing the "accrued financial benefits" of any pension plan or retirement system it offers. Count II alleged that the copay and deductible increases violate Const 1963, art 1, § 10 and US Const, art I, § 10, both of which prohibit the enactment of a law that impairs an existing contractual obligation.

Both sides moved for summary disposition on these counts and the trial court granted defendants' motion pursuant to MCR 2.116(C)(10). With respect to count I, the trial court rejected plaintiffs' claim that health care benefits are "accrued financial benefits" under Const 1963, art 9, § 24, holding that the Court of Appeals and this Court "'have been squarely faced with the opportunity to rule on this question and have declined to do so . . . .'" 260 Mich App at 462. With respect to count II, the trial court, after noting the similarity between the MPSERS health care plan and those offered by other states, concluded that MCL 38.1391(1) does establish a contract with the plaintiffs but that, because the proportions of the total costs for deductibles and copays borne by the plaintiffs were essentially unchanged, the impairment was too insubstantial to create an impairment the law would recognize.

Plaintiffs appealed to the Court of Appeals, which affirmed the trial court's ruling entirely. Thus, the panel held that health care benefits are not "accrued financial benefits" subject to protection by Const 1963, art 9, § 24, and that the Legislature's enactment of MCL 38.1391(1) created a contract, but the impairment was too *de minimis* to be recognized.

Plaintiffs applied for leave to appeal to this Court, seeking to challenge the Court of Appeals determinations that health care benefits are not "accrued financial benefits" protected by Const 1963, art 9, § 24 and that the deductible and copay increases implemented by the health care plan amendments are not a substantial impairment of plaintiffs' contractual right to receive health care benefits. Defendants filed an application for leave to appeal, seeking to challenge the Court of Appeals conclusion that MCL 38.1391(1) vests plaintiffs with a contractual right. We granted both applications and ordered that they be submitted together.[3]

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Taxpayers of Michigan Against Casinos v Michigan,* 471 Mich 306, 317; 685

---

[3] 471 Mich 875 (2004).

NW2d 221 (2004). This case also involves constitutional issues, as well as issues of statutory construction. These issues are reviewed de novo by this Court. *Wayne Co v Hathcock,* 471 Mich 445, 455; 684 NW2d 765 (2004).

### III. ANALYSIS OF CONST 1963, ART 9, § 24

Const 1963, art 9, § 24 provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

These two clauses unambiguously prohibit the state and its political subdivisions from diminishing or impairing "accrued financial benefits," and require them to fund "accrued financial benefits" during the fiscal year for which corresponding services are rendered. To apply this, we are called upon to determine what is an "accrued financial benefit" and, in particular, whether health care benefits are such a benefit.

This Court has twice considered the issue whether health care benefits fall within the ambit of "accrued financial benefits" protected by art 9, § 24. In the first instance, *Musselman v Governor,* 448 Mich 503; 533 NW2d 237

7

(1995) (*Musselman I*), six members of this Court[4] considered a constitutional challenge to the state's failure to fund retirement health care benefits being earned by nonretired public school employees during the 1990-1991 school year. In determining whether the state's failure to do so violated the "prefunding" requirement of the second clause of art 9, § 24, a four-member majority of this Court determined that health care benefits are, indeed, included within the term "accrued financial benefits." Focusing primarily on statements by some of the constitutional delegates who supported art 9, § 24 that they were concerned about the future ability of governmental entities to pay retirement benefits if the entities did not set aside funding to do so during each year of a public employee's service,[5] the majority reasoned that "because the purpose of the provision is to prevent governmental units from amassing bills for pension payments that they do not have money to pay, we hold that the term 'financial benefits' must include retirement health care benefits." *Musselman I, supra* at 513. Justice Riley, joined by

---

[4] Justice Weaver did not participate. 448 Mich at 503.

[5] *Musselman I, supra* at 512-513, quoting 1 Official Record, Constitutional Convention 1961, p 772 (delegate Stafseth); *Musselman I, supra* at 512 n 5, quoting 1 Official Record, Constitutional Convention 1961, p 771 (delegate Van Dusen).

Justice Levin, dissented from this portion of the majority's analysis primarily on the basis of her conclusion that the term "financial" is commonly understood to connote monetary obligations and, thus, the term "financial benefits" does not encompass health care benefits. *Id*. at 525-532.

This Court subsequently granted rehearing in *Musselman v Governor (On Rehearing),* 450 Mich 574; 545 NW2d 346 (1996) (*Musselman II*), and the prior majority lost a vote because Justice Brickley stated that he no longer believed that interpretation of art 9, § 24 was necessary to resolve the case. *Musselman II, supra* at 576-577. Justice Weaver, now participating, joined Justice Riley's dissent on the issue and also wrote separately, saying that the electorate could not have intended the phrase "accrued financial benefits" to include health care benefits because the pension and retirement systems in place at the time art 9, § 24 was adopted consisted only of monthly stipends. *Id.* at 579-580. Justice Weaver further concluded that statements by constitutional convention delegates show that they had employed the phrase "accrued financial benefits" for the specific purpose of limiting the contractual right of public school employees under art 9, § 24 to deferred compensation embodied in a pension plan. *Musselman II, supra* at 580, quoting 1 Official Record, Constitutional

9

Convention 1961, pp 771, 773-774 (delegate Van Dusen). Thus, with six justices splitting three to three on the issue, the question whether health care benefits are included within the phrase "accrued financial benefits" remained unresolved by this Court. However, as did the Court of Appeals in the present case,[6] we agree with Justices Riley, Weaver, and Levin that they are not.

As Justice Riley correctly pointed out in her dissent in *Musselman I*, the majority "misse[d] the mark" by focusing on the history behind art 9, § 24 and the intent of the constitutional convention delegates in proposing it, rather than on the interpretation that the people would have given the provision when they adopted it. *Musselman I, supra* at 526. Indeed, we recently stated the correct standard to be applied when interpreting constitutional provisions in *Hathcock, supra* at 468:

> The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification. [*People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004).] This rule of "common understanding" has been described by Justice COOLEY in this way:
>
> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great* mass *of the people themselves, would give it.* 'For as the Constitution does not derive its

---

[6] 260 Mich App at 473.

10

force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.'" [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971) (emphasis in original), quoting 1 Cooley, Constitutional Limitations (6th ed), p 81.]

In short, the primary objective of constitutional interpretation is to realize the intent of the people by whom and for whom the constitution was ratified.

In order to reach the objective of discerning the intent of the people when ratifying a constitutional provision, we apply the plain meaning of each term used therein at the time of ratification unless technical, legal terms were employed. *Phillips v Mirac, Inc,* 470 Mich 415, 422; 685 NW2d 174 (2004). In this case, the term "benefits" is modified by the words "financial" and "accrued." Because these adjectives are not technical, legal terms that would have been ascribed a particular meaning by those learned in the law at the time the Constitution was ratified,[7] we discern the intent of the people in ratifying art 9, § 24 by according the adjectives

---

[7] *Id.* at 425.

their plain and ordinary meanings at the time of ratification.[8]

We first note that, despite specifically stating that the threshold issue in determining whether health care benefits were subject to the prefunding requirement of the second clause of art 9, § 24 is whether they constitute "accrued financial benefits" within the meaning of the first clause of art 9, § 24,[9] the majority in *Musselman I* did not address the term "accrued." At the time that our 1963 Constitution was ratified, the term "accrue" was commonly defined as "to increase, grow," "to come into existence as an enforceable claim; vest as a right," "to come by way of increase or addition: arise as a growth or result," "to be periodically accumulated in the process of time whether as an increase or a decrease," "gather, collect, accumulate," *Webster's Third New Int'l Dictionary* (1961), p 13, or "to happen or result as a natural growth; arise in due course; come or fall as an addition or

---

[8] It seems apparent, but to foreclose confusion that the dissent may engender, that the 2004 view of the Governmental Accounting Standards Board (GASB) that the dissent relies on to define terms is entirely irrelevant to what ratifiers in 1963 would have understood. Furthermore, the passage quoted from the GASB by the dissent does not even purport to define any of these terms but merely directs how to handle the *accounting* fringe benefits entail.

[9] *Musselman I, supra* at 510.

12

increment," "to become a present and enforceable right or demand," *Random House American College Dictionary* (1964), p 9. Thus, according to these definitions, the ratifiers of our Constitution would have commonly understood "accrued" benefits to be benefits of the type that increase or grow over time—such as a pension payment or retirement allowance that increases in amount along with the number of years of service a public school employee has completed.[10] Health care benefits, however, are not benefits of this sort. Simply stated, they are not accrued. Under MCL 38.1390(1),[11] which the plaintiffs in this case rely on, neither the amount of health care benefits a public school employee receives nor the amount of the premium, subscription, or membership fee that MPSERS pays increases in relation to the number of years of service the retiree has performed.

That art 9, § 24 only protects those financial benefits that increase or grow over time is not only supported but, indeed, confirmed by the interaction between

---

[10] See, e.g., MCL 38.1384.

[11] MCL 38.1391(1) provides that "[t]he retirement system shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department."

the first and second clauses of that provision. Specifically, the first clause contractually binds the state and its political subdivisions to pay for retired public employees' "accrued financial benefits . . . ." Thereafter, the second clause seeks to ensure that the state and its political subdivisions will be able to fulfill this contractual obligation by requiring them to set aside funding each year for those "[f]inancial benefits arising on account of service rendered in each fiscal year . . . ." Thus, because the second clause only requires the state and its political subdivision to set aside funding for "[f]inancial benefits arising on account of service rendered in each fiscal year" to fulfill their contractual obligation of paying for "accrued financial benefits," it reasonably follows that "accrued" financial benefits consist only of those "[f]inancial benefits arising on account of service rendered in each fiscal year . . . ."[12]

Moreover, health care benefits do not qualify as "financial" benefits. At the time Const 1963, art 9, § 24

_____

[12] The dissent claims that we are not defining words with any reference to context. This is not the case. Indeed, we are as committed to that interpretive tool as the dissent claims to be, and this opinion bears witness to that. The difference between us, however, is that we are endeavoring to place words in the context of other words while the dissent places words in the context of something far more vague, apparently nothing more than its own sense of the preferred result.

14

was ratified, the term "financial" was commonly defined as "pertaining to monetary receipts and expenditures; pertaining or relating to money matters; pecuniary," *Random House, supra,* p 453, or "relating to finance or financiers," *Webster's, supra,* p 851, and "finance" was commonly defined as "pecuniary resources, as of . . . an individual; revenues," *Random House, supra*; accord *Webster's, supra.* "Pecuniary," in turn, was commonly defined as "consisting of or given or extracted in money," or "of or pertaining to money." *Random House, supra,* p 892; accord *Webster's, supra,* p 1663. Accordingly, the ratifiers of our Constitution would have commonly understood "financial" benefits to include only those benefits that consist of monetary payments, and not benefits of a nonmonetary nature such as health care benefits.

We further point out that, even if the phrase "accrued financial benefits" were ambiguous and, thus, it would be permissible or necessary to consult the statements of delegates during the constitutional convention debates, the majority's approach in doing so in *Musselman I* was fundamentally flawed. Specifically, although this Court has continually recognized that constitutional convention debates are relevant to determining the meaning of a particular provision, *Lapeer*

15

*Co Clerk v Lapeer Circuit Court,* 469 Mich 146, 156; 665 NW2d 452 (2003); *People v Nash,* 418 Mich 196, 209; 341 NW2d 439 (1983) (opinion by Brickley, J.), we take this opportunity to clarify that, when necessary, the proper objective in consulting constitutional convention debates is not to discern the intent of the framers in proposing or supporting a specific provision, but to determine the intent of the ratifiers in adopting the provision, *Nutt, supra* at 574.[13]   We highlighted this distinction in *Univ of Michigan Regents v Michigan,* 395 Mich 52, 59-60; 235 NW2d 1 (1975), in which we stated:

> The debates must be placed in perspective. They are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures.
>
> Therefore, we will turn to the committee debates only in the absence of guidance in the constitutional language . . . or when we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept.

Bearing this principle in mind, the primary focus of the majority in *Musselman I* should not have been on the intentions of the delegates in supporting art 9, § 24 but,

---

[13] "Constitutional Convention debates and the Address to the People are certainly *relevant as aids in determining the intent of the ratifiers.*" (Emphasis added.)

rather, on any statements they may have made that would have shed light on why they chose to employ the particular terms they used in drafting the provision to aid in discerning what the common understanding of those terms would have been when the provision was ratified by the people.[14]  In this regard, it is important to note that the majority in *Musselman I* did, in fact, locate such evidence but chose to disregard it, stating:

> The only explicit elaboration on the term "accrued financial benefits" was this remark by delegate Van Dusen:

> "The words 'accrued financial benefits' were used designedly, so that the contractual right of the employee would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits."

> Unfortunately, he addresses which rights are contractual, and thus enforceable at law under the first clause of Const 1963, art 9, § 24—a question distinct from what must be prefunded

---

[14] See, generally, *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 425-428; 157 NW2d 213 (1968), in which this Court examined, among other things, the statements of delegates to the constitutional convention and the Address to the People in order to discern the meaning of the term "civil rights" as used in Const 1963, art 5, § 29, but, in doing so, expressly recognized that "it is the Constitution, not the debates, that was finally submitted to the people.  While the debates may assist in an interpretation of the Constitution, neither they nor even the Address to the People is controlling."  *Beech Grove, supra* at 427.

17

under the second clause. [*Musselman I, supra* at 510 n 8, quoting 1 Official Record, Constitutional Convention 1961, pp 773-774.]

This statement by delegate Van Dusen is directly relevant to discerning the common understanding of the words "accrued" and "financial" at the time of the constitutional convention and, indeed, reinforces our conclusion that the ratifiers would have commonly understood the phrase "accrued financial benefits" to be one of limitation that would restrict the scope of protection provided by art 9, § 24 to monetary payments for past services. The *Musselman I* majority's stated reason for disregarding this statement, that delegate Van Dusen was stating why that phrase was used in the first clause of art 9, § 24, and not why it was used in the second clause, is illogical. Stated simply, there is no reason to believe that the ratifiers would have interpreted the phrase "accrued financial benefits" any differently when reading the second clause than they would have when reading the first. Indeed, it would be unreasonable to assume, in the circumstance where they were drafted together and presented to the ratifiers at the same time, that there was any other intent. In discussing this concept, Justice Cooley stated, "[a]s a general thing, it is to be supposed that the same word is used in the same sense wherever it occurs in a

18

constitution."   1 Cooley, Constitutional Limitations (8th ed), p 135.[15]

Thus, in summary, we hold that health care benefits are not protected by Const 1963, art 9, § 24 because they neither qualify as "accrued" benefits nor "financial" benefits as those terms were commonly  understood at the time of the Constitution's ratification and, thus, are not "accrued financial benefits."

IV.   ANALYSIS OF CONST 1963, ART 1, § 10 AND US CONST, ART I, § 10

The plaintiffs here assert that, by enacting MCL 38.1391(1), the Legislature created a contractual right by public school retirees to receive health care benefits and, further, that this contractual right could not be altered

---

[15] See, also, *Lockwood v Comm'r of Revenue,* 357 Mich 517, 536-537; 98 NW2d 753 (1959) (Carr, J., dissenting):

> It is incredible that the legislature in submitting to popular vote the proposed amendment [of Const 1908, art 10, § 23] at the general election in 1954, or that the people in voting thereon, intended that the term "sales tax" as used in the clauses of said amendment providing for the apportionment of sales tax funds in the manner stated therein, and in inhibiting the legislature from increasing the sales tax above 3%, intended to use the term in question with different meanings. *In other words, it must be assumed that the designation was used* in the proviso imposing limitation on the power of the legislature with reference to the increase in the sales tax *with exactly the same meaning* as clearly intended in the  so-called diversion clauses. [Emphasis added.]

19

or abolished by successive legislatures without violating Const 1963, art 1, § 10[16] and US Const, art I, § 10,[17] both of which prohibit the state from enacting any law that impairs existing contractual obligations.   We disagree.

MCL 38.1391(1) provides:

> The retirement system[18] shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department.[19]

The Court of Appeals determined that this statute does create for plaintiffs a contractual right to receive health care benefits, but that the copay and deductible increases implemented by the board do not amount to a substantial impairment of that contractual right.  However, we conclude that MCL 38.1391(1) does not create for retirees a contractual right to receive health care benefits and,

---

[16] "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted."

[17] "No State shall  . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

[18] "Retirement system" refers to the MPSERS.  MCL 38.1307(8).

[19] "Department" refers to the Department of Management and Budget.  MCL 38.1304(4).

therefore, reverse the Court of Appeals determination on that point.

Of primary importance to the viability of our republican system of government is the ability of elected representatives to act on behalf of the people through the exercise of their power to enact, amend, or repeal legislation. Therefore, a fundamental principle of the jurisprudence of both the United States and this state is that one legislature cannot bind the power of a successive legislature.[20] We recently reiterated this principle at length in *LeRoux v Secretary of State,* 465 Mich 594, 615-616; 640 NW2d 849 (2002), quoting *Atlas v Wayne Co Bd of Auditors,* 281 Mich 596, 599; 275 NW 507 (1937):

> "The act of one legislative body does not tie the hands of future legislatures. *Cooper, Wells & Co v City of St Joseph,* 232 Mich 255 [205 NW 86 (1925)]. The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors . . . . [Additionally,] [o]ne legislature cannot enact irrepealable legislation or limit or restrict its own power, or the power of its successors, as to the repeal of statutes;

---

[20] *United States v Winstar Corp,* 518 US 839, 873; 116 S Ct 2432; 135 L Ed 2d 964 (1996) (opinion by Souter, J.); *Community-Service Broadcasting of Mid-America, Inc v Fed Communications Comm,* 192 US App DC 448, 459; 593 F2d 1102 (1978); *Mirac, supra* at 430; *Ballard v Ypsilanti Twp,* 457 Mich 564, 569; 577 NW2d 890 (1998).

and an act of one legislature is not binding on, and does not tie the hands of, future legislatures."

Although this venerable principle that a legislative body may not bind its successors can be limited in some circumstances because of its tension with the constitutional prohibitions against the impairment of contracts, thus enabling one legislature to contractually bind another, *Winstar, supra* at 872-874, such surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments, *id.* at 874-875. A necessary corollary of these limitations that has been developed by the United States Supreme Court, and followed by this Court, is the strong presumption that statutes do not create contractual rights. *Nat'l R Passenger Corp v Atchison, Topeka & Santa Fe R Co,* 470 US 451, 465-466; 105 S Ct 1441; 84 L Ed 2d 432 (1985); *In re Certified Question (Fun 'N Sun RV, Inc v Michigan),* 447 Mich 765, 777-778; 527 NW2d 468 (1994). This presumption, and its relation to the protection of the sovereign powers of a legislature, was succinctly described by the United States Supreme Court in *Nat'l R, supra* at 465-466:

> For many decades, this Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but

22

merely declares a policy to be pursued until the legislature shall ordain otherwise." *Dodge* v. *Board of Education,* 302 U.S. 74, 79 [58 S Ct 98; 82 L Ed 57] (1937). See also *Rector of Christ Church* v. *County of Philadelphia,* 24 How. 300, 302 [65 US 300; 16 L Ed 602] (1861) ("Such an interpretation is not to be favored"). This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. *Indiana ex rel. Anderson* v. *Brand,* 303 U.S. 95, 104-105 [58 S Ct 443; 82 L Ed 685] (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, "'[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" *Keefe* v. *Clark,* 322 U.S. 393, 397 [64 S Ct 1072; 88 L Ed 1346] (1944) (quoting *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 548 [36 US 420; 9 L Ed 773] (1837)). Thus, the party asserting the creation of a contract must overcome this well-founded presumption, *Dodge, supra,* at 79, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

The first step in this cautious procession is to examine the statutory language itself. *Nat'l R, supra* at 466. In order for a statute to form the basis of a contract, the statutory language "must be 'plain and susceptible of no other reasonable construction' than that the Legislature intended to be bound to a contract." *In re Certified Question, supra* at 778, quoting *Stanislaus Co v San Joaquin & King's River Canal & Irrigation Co,* 192 US

23

201, 208; 24 S Ct 241; 48 L Ed 406 (1904). If the statutory language "'provides for the execution of a written contract *on behalf of the state* the case for an obligation binding upon the state is clear.'" *Nat'l R, supra* at 466, quoting *Dodge, supra* at 78 (emphasis supplied in *Nat'l R*). But, "absent 'an adequate expression of an actual intent' of the State to bind itself," courts should not construe laws declaring a scheme of public regulation as also creating private contracts to which the state is a party. *Nat'l R, supra* at 466-467, quoting *Wisconsin & Michigan R Co v Powers,* 191 US 379, 386-387; 24 S Ct 107; 48 L Ed 229(1903). In addition to the absence of contractual language, some federal courts, when interpreting statutes involving public-employee pension benefit plans, have expressed even greater reluctance to infer a contractual obligation where a legislature has not explicitly precluded amendment of a plan. *Nat'l Ed Ass'n-Rhode Island v Retirement Bd of the Rhode Island Employees' Retirement System,* 172 F3d 22, 27 (CA 1, 1999). This reluctance stems not only from the caution against finding an implied surrender of legislative power, but also from the realization that legislatures frequently need to utilize that power to modify benefit programs and compensation schedules. *Id.* Further, this reluctance is grounded in the realization that "it is easy enough for a

24

statute explicitly to authorize a contract or to say explicitly that the benefits are contractual promises, or that any changes will not apply to a specific class of beneficiaries (*e.g.*, those who have retired)." *Id.* at 27-28 (citations omitted). In the area of worker's compensation, this Court has also followed this principle and stated that, as a general rule, a statute will not be held to have created contractual rights "if 'the Legislature did not covenant not to amend the legislation.'" *In re Certified Question, supra* at 778, quoting *Franks v White Pine Copper Div,* 422 Mich 636, 654; 375 NW2d 715 (1985). Finally, in addition to the absence of such clear and unequivocal statutory language, the circumstances of a statute's passage may "belie an intent to contract away governmental powers." *Nat'l R, supra* at 468.

The plaintiffs in this case have failed to overcome the strong presumption that the Legislature did not intend to surrender its legislative powers by entering into a contractual agreement to provide retirement health care benefits to public school employees when it enacted MCL 38.1391(1). Nowhere in MCL 38.1391(1), or in the rest of the statute, did the Legislature provide for a written contract on behalf of the state of Michigan or even use

25

terms typically associated with contractual relationships,[21] such as "contract," "covenant," or "vested rights."[22] Had the Legislature intended to surrender its legislative powers through the creation of contractual rights, it would have expressly done so by employing such terms. Indeed, by its plain language, the statute merely shows a policy decision by the Legislature that the retirement system pay "the entire monthly premium or membership or subscription fee" for the listed health care benefits on behalf of a retired public school employee who chooses to participate in whatever plan the board and the Department of Management and Budget authorize. However, nowhere in the statute did

---

[21] *Nat'l R, supra* at 467.

[22] It is clear that the Legislature can use such nomenclature when it wishes to. For instance, when enacting 1982 PA 259, which requires the state treasurer to pay the principal of and interest on all state obligations, the Legislature provided in MCL 12.64: "*This act shall be deemed a contract* with the holders from time to time of obligations of this state." (Emphasis added.) Similarly, when enacting the State Housing Development Authority Act, 1966 PA 346, the Legislature provided in MCL 125.1434: "*The state pledges and agrees* with the holders of any notes or bonds issued under this act, *that the state will not limit or alter the rights vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of the holders* until the notes or bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders, are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such notes or bonds." (Emphasis added.)

the Legislature require the board and the department to authorize a particular plan containing a specific monthly premium, membership, or subscription fee or, alternatively, explicitly preclude the board and the department from amending whatever plan they authorize.[23]  Additionally, nowhere in the statute did the Legislature require the board and the department to authorize a plan containing specified deductibles and copays.  In fact, nowhere in the statute did the Legislature even mention deductibles and copays.    Further, nowhere in the statute did the Legislature covenant that it would not amend the statute to remove or diminish the obligation of the MPSERS to  pay the monthly premium, membership, or subscription fee; nor did it covenant that any changes to the plan by the board and the department, or amendments to the statute by the Legislature, would apply only to a specific class or group of public school retirees.[24]  Again, had the Legislature intended to surrender its power to make such changes, it would have done so explicitly.

Although we need not do so because of the absence of clear and unequivocal language showing an intent to

---

[23] *Nat'l Ed Ass'n-Rhode Island*, *supra* at 27.

[24] *Id*. at 27-28; *In re Certified Question, supra* at 778.

contract, we note that the circumstances surrounding the Legislature's enactment of MCL 38.1391(1) provide further evidence that the Legislature did not intend to contract away its legislative powers.[25] As was discussed by the Court of Appeals, initially the Legislature required the MPSERS to pay a portion of the premium for health care benefits for public school retirees through the enactment of the predecessor of MCL 38.1391, former MCL 38.325b of the Public School Employees Retirement Act, 1945 PA 136, and subsequent legislatures have exercised their powers to amend the statute many times throughout the years to change the type of plans that the board could authorize, the criteria for the beneficiaries on whose behalf the MPSERS could pay the premiums for various benefits, and the amounts of those premiums that the MPSERS was required to pay.[26] Thus, there is no indication that the Legislature that enacted MCL 38.1391(1) in 1980 intended to do anything beyond what its predecessors had done—set forth a policy to be pursued until one of its successor legislatures ordained a new policy.[27] Additionally, as was also analyzed by the Court of Appeals, the health care plan itself has been

---

[25] *Nat'l R, supra* at 468.

[26] 260 Mich App at 463-465.

[27] *Nat'l R, supra* at 466.

amended and modified by the MPSERS numerous times since 1975, not only to increase the benefits available but also to increase the amounts of the copays and deductibles that participants were required to pay.[28]  In their appeal to this Court, plaintiffs have not only conceded that these statutory amendments and changes to the plan have occurred, but also expressly conceded during oral argument that the Legislature and the board have the authority to make such changes.  Thus, plaintiffs themselves, by the positions they have taken, have effectively recognized that MCL 38.1391(1) merely established a legislative policy that could be changed by a successor legislature rather than providing for a surrender of such legislative power through the creation of a contractual relationship.

---

[28] The Court of Appeals, 260 Mich App at 465-466, stated:

> The MPSERS provides a health care plan for retirees. Cost-sharing features have been a part of the health plan since its inception in 1975. The individual and family deductible component of the health care plan has gradually increased from 1982 to 1999, beginning with a deductible of $50 for each person and $100 for each family in 1982, and gradually rising to a deductible of $145 for each person and $290 for each family in 1999. Cost sharing for the prescription drug program also had gradual increases, ranging from a copay of ten percent in 1975 to a copay of $4 for generic drugs and $8 for brand name drugs in 1997 through March 31, 2000. There is no dispute that the MPSERS health care plan also gradually increased the benefits available under the plan.

We further note that, as part of the 1979 Public School Employees Retirement Act, in which MCL 38.1391(1) is included, the Legislature also enacted MCL 38.1303a(1), which defines "compensation" for public school employees as "the remuneration earned by a member for service performed as a public school employee." Thus, by enacting this statute, the Legislature recognized that an implied-in-law contractual relationship can arise between the school system and public school employees. Specifically, a public school employee can become contractually entitled to "compensation" by first performing services. However, payment of health care premiums by the MPSERS under MCL 38.1391(1) is not among the list of items that the Legislature specifically set forth as being part of an employee's "compensation" in MCL 38.1303a(2)(a) through (h). Additionally, and more importantly, MCL 38.1303a(3) expressly lists items that are *not* included within the definition of compensation and includes, among other things, "*[p]ayments for hospitalization insurance* and life insurance premiums,"[29] and "[o]ther fringe benefits paid by and from the funds of employers of public school employees."[30] This causes us to conclude that surely the

---

[29] MCL 38.1303a(3)(c) (emphasis added).

[30] MCL 38.1303a(3)(d).

Legislature would not specifically exclude the payment of health care benefits from the list of items that a public school employee could, potentially, become contractually entitled to by having performed services but, at the same time, intend to vest plaintiffs with a contractual right to receive such benefits through the simultaneous enactment of MCL 38.1391(1). Accordingly, it seems evident that the way to understand these enactments is that the Legislature intended for payment of health care benefits by the MPSERS under MCL 38.1391(1) to simply be a "fringe benefit" to which public school employees would never have a contractual entitlement.[31]

Thus, because the plain language of MCL 38.1391(1) does not clearly indicate that the Legislature intended to surrender its legislative powers through the statute's enactment, we hold that MCL 38.1391(1) does not create for public school employees a contractual right to health care

---

[31] This fact not only belies plaintiffs' claim that MCL 38.1391(1) shows a legislative intent to vest public school retirees with a contractual right to health care benefits, but also renders erroneous the Court of Appeals statement that "[h]ealth insurance is part of an employee's benefit package and the whole package is an element of consideration that the state contracts to tender in exchange for services rendered by the employee." 260 Mich App at 476. Indeed, MCL 38.1303a makes clear that payment of health care benefits by the MPSERS is *not* an element of the consideration that the state contracts to tender as remuneration for a public school employee's services.

benefits. We therefore reverse the Court of Appeals conclusion to the contrary. However, because the Court of Appeals ultimately reached the correct result, we affirm its ultimate conclusion to uphold the circuit court's entry of summary disposition in favor of defendants.[32]

## V. RESPONSE TO THE DISSENT

We would be remiss if we failed to point out that the ad hoc analysis employed by the dissent to determine that public school retirees possess a contractual right to health care benefits, rendering the Legislature powerless to alter or do away with them, is particularly disturbing and, taken to its logical conclusion, would undermine this state's constitutionally guaranteed republican system of government.

The most treasured civic possession of an American citizen is the right to self-government. It is the central pillar and animating force of our constitutions. Thus, US Const, art IV, § 4 provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ." The Michigan Constitution, Const 1963, art 1, § 1 states similarly that "[a]ll political power is

_____

[32] Having concluded that MCL 38.1391(1) does not create a contract, we need not address plaintiffs' argument challenging the Court of Appeals determination that the copay and deductible increases do not operate as a substantial impairment of a contractual relationship.

32

inherent in the people," and the importance the founding generation gave to this can be seen by its reiteration repeatedly in the documents preceding, coinciding with, and following the adoption of the United States Constitution in 1789. Thus, Congress provided in the Northwest Ordinance that the constitutions and governments of the states to be formed in the territory, of which states Michigan is one, "shall be republican . . . ." Northwest Ordinance of 1787, art V. This requirement was carried forward by Congress when it severed Michigan from the Northwest Territory in 1800 and made it part of the Indiana Territory, 2 US Stat, Ch XLI, § 2, and again in 1805 when it likewise severed Michigan from the Indiana Territory and established the Michigan Territory, 2 US Stat, Ch V, § 2, by requiring both times that the government established in those territories was to be "in all respects similar" to that provided in the Northwest Ordinance of 1787.

What this means concretely is that what one legislature has done, pursuant to the majority sentiment at that time, a later legislature responding to the then majority can modify or undo. Deprived of this right, self-government is not just hollow, it is nonexistent.

Yet, as the United States Supreme Court has held and we have discussed in this opinion, when the Legislature enters into a contract, a subsequent legislature cannot

33

repudiate that contract.  It seems obvious that to read what is a contract too broadly swallows the right of the people to change the course of their governance.  This is the tension that we have attempted to address and thoroughly analyze, whereas the dissent has just blithely assumed that any benefit once conferred is a contract and cannot be altered.  This is an ill-considered notion that in cases yet to be seen, but surely to be seen if this were to become the majority position, means that, for example, general assistance welfare benefits could not be altered, Medicaid would be frozen in its first enacted form, and, in short, any financial benefit would be unalterable.

This is not and surely cannot be our law.  Yet, the dissent claims that the recipients of the benefits will be surprised it is not.  Will they?  No one should be surprised that benefit battles are fought out in the Legislature.  On the contrary, those who could claim legitimate surprise would be our citizens who, were there two more votes on this Court to join the dissent and make it a majority, would have lost, in the fog of a baffling contract analysis, the right to change the course of their government.  Indeed, that would be more than surprising, it would be revolutionary.

## VI.   CONCLUSION

We hold that health care benefits are not "accrued financial benefits" and, thus, are not protected by Const 1963, art 9, § 24.   Accordingly, we affirm the Court of Appeals on this issue.   We further hold that the Legislature did not intend to create a contractual relationship with public school employees by enacting MCL 38.1391(1) and, thus, payment of health care benefits by the MPSERS is not a contractual right subject to protection by Const 1963, art 1, § 10 and US Const, art I, § 10.   We therefore reverse the Court of Appeals determination on this issue.   However, because the Court of Appeals reached the correct result, we affirm its determination that the circuit court properly entered summary disposition in defendants' favor.

> Clifford W. Taylor
> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman

# STATE OF MICHIGAN

## SUPREME COURT

ALBERTA STUDIER, PATRICIA M.
SANOCKI, MARY A. NICHOLS, LAVIVA
M. CABAY, MARY L. WOODRING, and
MILDRED E. WEDELL,

    Plaintiffs-Appellants,

v                                           No. 125765

MICHIGAN PUBLIC SCHOOL EMPLOYEES'
RETIREMENT BOARD, MICHIGAN PUBLIC
SCHOOL EMPLOYEES' RETIREMENT SYSTEM,
DEPARTMENT OF MANAGEMENT AND BUDGET,
and TREASURER OF MICHIGAN,

    Defendants-Appellees.
_____/

ALBERTA STUDIER, PATRICIA M.
SANOCKI, MARY A. NICHOLS, LAVIVA
M. CABAY, MARY L. WOODRING, and
MILDRED E. WEDELL,

    Plaintiffs-Appellees,

V                                           No. 125766

MICHIGAN PUBLIC SCHOOL EMLOYEES'
RETIREMENT BOARD, MICHIGAN PUBLIC
SCHOOL EMPLOYEES' RETIREMENT SYSTEM,
DEPARTMENT OF MANAGEMENT AND BUDGET,
and TREASURER OF MICHIGAN,

    Defendants-Appellants.
_____/

WEAVER, J. (*concurring*).

    I concur in the majority conclusion and reasoning that
the Legislature did not intend to create a contractual

right subject to Const 1963, art 1, § 10 and US Const, art I, § 10 when it provided for payment of health care benefits to public school employees through the enactment of MCL 38.1391(1).

Regarding whether health care benefits paid to public school retirees are "accrued financial benefits" under Const 1963, art 9, § 24, I concur with the majority conclusion that they are not. I agree with the majority that "the ratifiers of our Constitution would have commonly understood 'financial' benefits to include only those benefits that consist of monetary payments, and not benefits of a nonmonetary nature such as health care benefits." *Ante* at 15. As noted by Justice Riley in her partial concurrence and partial dissent regarding art 9, § 24 in *Musselman v Governor,* 448 Mich 503, 526; 533 NW2d 237 (1995) (*Musselman I),* "when interpreting the language of the constitution, unambiguous terms are given their plain meaning." Justice Riley concluded that the "normal usage of the word 'financial' connotes money and 'money' connotes some form of hard currency that can be 'spent.'" *Id.* at 527. When the Court granted rehearing in *Musselman*, I concurred with Justice Riley's *Musselman I* analysis of the common understanding of the term "accrued financial benefits" and I continue to agree with her analysis today. In *Musselman v Governor (On Rehearing),* 450 Mich 574; 545

2

NW2d 346 (1996)(*Musselman II*), I wrote further to note that Justice Riley's conclusion was supported by the fact that health care benefits did not exist when the people ratified the 1963 Michigan Constitution. Because health care benefits did not exist at that time, the people would not have anticipated that the pension and retirement systems established by Const 1963, art 9, § 24 included health care benefits. *Mussleman II* at 579.

Elizabeth A. Weaver

# STATE OF MICHIGAN

## SUPREME COURT

ALBERTA STUDIER, PATRICIA M.
SANOCKI, MARY A. NICHOLS, LAVIVA
M. CABAY, MARY L. WOODRING, and
MILDRED E. WEDELL,

    Plaintiffs-Appellants,

v                                  No. 125765

MICHIGAN PUBLIC SCHOOL EMPLOYEES'
RETIREMENT BOARD, MICHIGAN PUBLIC
SCHOOL EMPLOYEES' RETIREMENT SYSTEM,
DEPARTMENT OF MANAGEMENT AND BUDGET,
AND TREASURER OF MICHIGAN,

    Defendants-Appellees.
_____/

ALBERTA STUDIER, PATRICIA M.
SANOCKI, MARY A. NICHOLS, LAVIVA
M. CABAY, MARY L. WOODRING, and
MILDRED E. WEDELL,

    Plaintiffs-Appellants,

v                                  No. 125766

MICHIGAN PUBLIC SCHOOL EMPLOYEES'
RETIREMENT BOARD, MICHIGAN PUBLIC
SCHOOL EMPLOYEES' RETIREMENT SYSTEM,
DEPARTMENT OF MANAGEMENT AND BUDGET,
AND TREASURER OF MICHIGAN,

    Defendants-Appellees.

_____/

CAVANAGH, J. (*dissenting*).

    I believe that retirement health care benefits earned
by public school employees constitute "accrued financial

benefits" that are protected by our Michigan Constitution from diminishment or impairment. I also believe that the statute that provides retirement health care benefits for public school employees, MCL 38.1391, creates a contract with public school employees and retirees that cannot be substantially impaired. Because there are significant questions about the accuracy of the record used by the lower courts to determine if a substantial impairment indeed occurred, I would remand for further review. Accordingly, I respectfully dissent from the majority's position that public school employees and retirees are without protection from the prospect that their retirement health care benefits may be drastically decreased or even eliminated.

## I. HEALTH CARE BENEFITS ARE "ACCRUED FINANCIAL BENEFITS" WITHIN THE MEANING OF MICHIGAN'S CONSTITUTION

Const 1963, art 9, § 24 provides the following:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

2

Whether health care benefits are "accrued financial benefits" has already been addressed by this Court in *Musselman v Governor*, 448 Mich 503, 510; 533 NW2d 237 (1995) (*Musselman I*), and *Musselman v Governor (On Rehearing)*, 450 Mich 574; 545 NW2d 346 (1996) (*Musselman II*). In *Musselman I*, this Court examined whether health care benefits are indeed "financial" benefits. We held that because the purpose of the constitutional provision is to prevent the state from amassing bills for pension payments, including health care benefits, for which the state does not have the money to pay, the term "financial benefits" includes retirement health care benefits.

Reflecting on the analysis in *Musselman I*, I fail to see its flaws. This Court reasonably concluded that the goal of the constitutional provision is to ensure that the state can pay for the commitments it has made. Regardless of whether the commitment is for a straightforward monthly cash allowance to a retiree or for payment of health care benefits for a retiree, the state must still pay for its obligations. If the state has failed to set aside an appropriate amount of money, the situation is still the same, meaning the state still has a *financial* consequence.

I believe this interpretation is the one that the people gave the constitutional provision when it was adopted because it best reflects the common understanding

3

of the people. See *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 745; 330 NW2d 346 (1982). The most reasonable interpretation of the phrase "accrued financial benefits" includes health care benefits. Health care benefits are given in lieu of additional compensation to public school employees. A health care benefit is a *financial* benefit because it clearly costs the state money and has an economic value to the employee. Notably, our Constitution was not written to include every conceivable aspect of a pension plan. It was certainly not beyond the understanding of the ratifiers that health care benefits, which cost the state money, would be offered as a retirement benefit. As such, these benefits would need to be protected, just as monthly cash allowances to retirees must be protected.

As we stated in *Musselman I, supra* at 516 n 12, "Many delegates to the 1961 Constitutional Convention perceived as unfair the rule that pensions granted by public authorities were not contractual obligations, but rather gratuitous allowances that could be revoked at will." See, e.g., 1 Official Record, Constitutional Convention 1961, pp 770-774. It should not come as a surprise that the ratifiers would believe this to be true about health care benefits that mean as much, if not more, to many retirees.

4

Moreover, even if the ratifiers did not imagine every conceivable pension plan benefit that would be offered, the "idea behind formulating a general rule, as opposed to a set of specific commands, is that a rule governs possibilities that could not have been anticipated at the time." *Musselman I, supra* at 514.[1] The constitutional provision was meant to address *all* public employee retirement systems; it is entirely reasonable that the ratifiers would not be aware of every possible retirement benefit being offered to every public employee. See, e.g., 1 Official Record, Constitutional Convention 1961, p 771. In response to a question whether the state could increase benefits and whether an increase in benefits would be a gratuity or an obligation that the state must fulfill, a constitutional convention delegate responded as follows: "Certainly there's nothing here to prohibit the employer from increasing the benefit structure." *Id*. at 774. "Once the employee, by working pursuant to an understanding that

---

[1] We believe that this constitution must be a forward looking document; that it must take cognizance of the problem; that it must spell out for the future the manner in which these funds should be managed, so that our children will not, 50 years hence, suffer from the fact that we failed to put in enough money to take care of the benefits attendant upon the service currently performed by public employees. [1 Official Record, Constitutional Convention 1961, p 771.]

5

this is the benefit structure presently provided, has worked in reliance thereon, he has the contractual right to those benefits which may not be diminished or impaired." *Id.*

The constitutional principle declared is that accrued financial benefits, including health care benefits, will be protected for retirees. Simply, "once an employee has performed the service in reliance upon the then prescribed level of benefits, the employee has the contractual right to receive those benefits under the terms of the statute or ordinance prescribing the plan." *Id.* at 771.

In attempting to define the term "accrued financial benefits," the majority cites numerous definitions for the word "accrue," and I do not quarrel with those definitions.[2] Indeed, as the majority states, "accrue" means "to increase, grow" and "to come into existence as an enforceable claim; vest as a right." *Ante* at 12 (citation

_____

[2] While I do not quarrel with the definitions used, I must note that the majority yet again insists on relying solely on dictionary definitions to the illogical exclusion of context. "There is no more irritating fellow than the man who tries to settle an argument about communism, or justice, or liberty, by quoting from Webster." Pflug, ed, *The Ways of Language* (New York: The Odyssey Press, Inc, 1967), ch 4, How to Read a Dictionary, p 62. While dictionary definitions are certainly useful, they must be examined *in context*. See also Hayakawa, *Language in Thought and Action* (New York: Harcourt, Brace and Co, 1949), ch 4, p 62 ("Interpretation *must* be based, therefore, on the totality of contexts.").

6

and internal quotation marks omitted).  However, I disagree with the majority's assertion that the ratifiers of our Constitution would have commonly understood "accrued" to mean that an *individual's* benefits must increase or grow *over time*.  The majority seems to believe that to be an accrued financial benefit, an employee's retirement health care benefits must gradually increase on the basis of the number of years that the person is employed, yet this is not accurate.  The term "accrued financial benefits" was used to denote benefits that were contractual obligations on the part of the state.  The term "accrued financial benefits" was meant to include benefits that an employee *had worked in reliance on and continued to work in reliance on*.  This is in contrast to the term "financial benefits," which was used in the second clause of the constitutional provision to denote a system in which the benefits earned for the year were funded annually.  Because the second clause only specifically dealt with how to fund benefits earned in a given year, retirement systems would eventually need to address the funding for benefits that had been earned in prior years but had not been properly funded.  1 Official Record, Constitutional Convention 1961, pp 773-774.[3]

---

[3] The constitutional provision does two things:

(continued…)

When a public school employee has fulfilled his commitment and is then entitled to receive health care benefits once he retires, the employee has an enforceable claim to receive the benefits upon retirement. "Accrued" does not mean that the amount of benefits the employee will receive during retirement must grow in conjunction with the employee's years of service. For an employee to have an accrued financial benefit, he must fulfill the obligations set forth by the state. For plaintiffs, all the events that are necessary for them to receive their benefits have come into existence. Simply, plaintiffs went to work and did their jobs for the required number of years. As our Constitution states, accrued financial benefits "shall be a contractual obligation thereof which shall not be

_____

(…continued)

> [I]n the first paragraph, it provides that the relationship between the employing unit and the employee shall be a contractual relationship so that the municipality may not change the relationship at its will. The benefits that have accrued up to a given time are contractual and must be carried out by the municipality or by the state. The second paragraph provides that each year the system shall pay in enough money to fund the liability arising in that year. It does not require that the system catch up with all of its past liability, which would be an impossibility in connection with some of the state systems, but it does require that they shall not go any further behind. [2 Official Record, Constitutional Convention 1961, p 2659.]

diminished or impaired thereby." Const 1963, art 9, § 24. Once an employee has fulfilled his obligation, the state must fulfill its obligation and be prepared to pay retirement health care benefits when necessary.

Additionally, even if the term "accrued financial benefits" were viewed as a term more commonly used by accountants and actuaries than by laypersons, its meaning would still encompass retirement health care benefits. As stated by the Governmental Accounting Standards Board (GASB), cash payments and other retirement benefits, such as health care benefits, "are conceptually similar transactions-both involve *deferred compensation* offered in exchange for current services—and should be accounted for in a similar way." Governmental Accounting Standards Board, Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions, Statement No. 45, June 2004, p 73 (emphasis added).[4] As noted by the majority, "'"[t]he words 'accrued financial benefits' were used designedly, so that the contractual right of the employee would be limited to the *deferred compensation*

_____

[4] The GASB also states that retirement health care benefits, like monthly cash allowances, arise "from an exchange of salaries and benefits for employee services rendered and constitute[] part of the compensation for those services." *Id.* at 1. Retirement benefits "are an *exchange of promised benefits for employee services.*" *Id.* at 77.

9

embodied in any pension plan . . . ."'" *Ante* at 17, quoting *Musselman I, supra* at 510 n 8, quoting 1 Official Record, Constitutional Convention 1961, pp 773-774 (emphasis added). By any standard employed, the meaning of the term "accrued financial benefits" encompasses retirement health care benefits for public school employees.

## II. HEALTH CARE BENEFITS ARE CONTRACTUAL OBLIGATIONS

The United States Constitution provides in relevant part, "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ." US Const, art I, § 10, cl 1. Michigan's Constitution provides, "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." Const 1963, art 1, § 10.

Information about retirement health care benefits for Michigan's public school employees is set forth in MCL 38.1391. MCL 38.1391(1) states that the state is responsible for paying the monthly premiums for plaintiffs' health care benefits.[5] In *Musselman I, supra* at 516, this Court stated that the obligation to pay retirement health

_____

[5] MCL 38.1391(1) provides, "The retirement system shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department."

10

care benefits "is a contractual right arising from the fact that employees have worked in reliance on the statutory promise that the board will pay earned health care benefits of any member receiving a retirement allowance."  In *Musselman I, supra* at 519 n 19, the defendants even conceded "that retirement health care benefits are contractual benefits subject to Const 1963, art 1, § 10." Further, "the defendants conceded that these statutes create a right to receive health benefits that may not be impaired."  *Musselman I, supra* at 505 n 1.

The statute's intent is clear-in exchange for receiving years of an employee's services, the state will pay for retirement health care benefits.  This unconditional guarantee is what many public school employees and retirees have relied on throughout the years, and the state has benefited from that reliance.  As stated at the constitutional convention, "[T]here is no question that when an employee today takes employment with a governmental unit, he does so with the idea that there is a pension plan or retirement system involved."  1 Official Record, Constitutional Convention 1961, p 773.  The majority's position now allows the state to choose, at its whim, not to fulfill its obligation under the contract even though employees have already performed the

11

responsibilities necessary to fulfill their obligations under the contract.

The state did not offer retirement health care benefits to public school employees to be charitable; it did so to remain competitive in the marketplace. See 1 Official Record, Constitutional Convention 1961, p 773. And public school employees do not "receive" these benefits for free. Because retirement health care benefits cost money, the monetary compensation for public school employees had to have been factored into the equation. It is unreasonable to now claim that public school employees, who received less compensation because of the benefits they believed they would receive when they retired, are now no longer entitled to the health care benefits they worked to receive. Stability in retirement benefits is likely at least *part* of the reasons why many people chose to accept a position with the public schools or stay in that position, and it is untenable to tell these employees and retirees that it was for naught.

The majority attempts to buttress its argument by noting the definition for "compensation" provided by MCL 38.1303a(1). However, the definition of "compensation" in MCL 38.1303a does not indicate that retirement health care benefits are not to be considered "accrued financial benefits" or are not contractual obligations that the state

12

must fulfill.  The items listed in MCL 38.1303a are used to determine a retiree's monthly cash allowance.  See, e.g., MCL 38.1309; MCL 38.1379; MCL 38.1384.  However, this does not mean that the state is absolved of its responsibility to fulfill its obligations.  The majority even states the fundamental concept that is critical to the analysis of this issue:  "Specifically, a public school employee can become contractually entitled to 'compensation' by first performing services."  *Ante* at 30.  Because retirement health care benefits for public school employees are deferred compensation, see *ante* at 17, I fail to comprehend how the majority can justify its misapplication of a basic contract principle. I am quite certain that it comes as a surprise to the over 140,000 public school employees that their retirement health care benefits are nothing more than a "policy decision" that the Legislature can choose to alter or eliminate at its whim.  To many retirees, the health care benefits they receive through their pension plan are every bit as important, if not more so, than the monthly cash allowance they receive through their pension plan.  Public school employees surely did not envision that they were afforded no protection against their retirement health care benefits being capriciously eliminated.  The

13

provision of health care benefits for retirees is not a gratuitous undertaking by defendants.[6] It is a benefit that is provided to plaintiffs in exchange for years of service. Defendants are not altruistically *giving* plaintiffs these benefits, plaintiffs *earned* them through years of hard work and dedication. Plaintiffs fulfilled their obligations, and the state should fulfill its obligation.

Finally, contrary to the majority's panic-stricken response to the dissent, the Constitution and our system of government are not under attack merely because I disagree with the majority over the interpretation of the words of the Constitution and the applicable statute. Regardless of the majority's attempt to distract the reader from the issues at hand, reading the plain words of the statute to indicate that a contract was made with public school employees and retirees does not mean that no legislative action can ever be amended or repealed. It does not mean that welfare benefits could never be altered, as the majority's rhetoric proclaims. It merely means that when

---

[6] In *Ramey v Pub Service Comm*, 296 Mich 449, 462; 296 NW 323 (1941), this Court held that vacation with pay is not a gratuity—*it is compensation for services rendered*. If paid vacation time is not considered a gratuity, then I cannot fathom how retirement health care benefits can be considered a gratuity when they are part of the consideration that was exchanged for the years of service provided by public school employees.

14

reading *this* statute, it is clear that the words chosen by the Legislature were meant to oblige the state to provide the retirement health care benefits that were promised to public school employees.

While the majority accurately states that benefit battles are fought in the Legislature, it inaccurately states that benefits "won" can then be changed at the whim of a subsequent legislature. Once benefits have been guaranteed to workers and the workers have served the state in reliance on them, it is unconstitutional to substantially impair the receipt of these earned benefits.

The dissent states a concept that is really quite unremarkable. The government, just like any other party to a contract, must fulfill its obligation. When a public school employee has worked for years in reliance on a promise of retirement health care benefits, our system of government is not challenged by the simple notion that the state must provide these benefits.

### III. ADDITIONAL DISCOVERY IS NECESSARY TO PROPERLY ASSESS WHETHER DEFENDANTS' ACTIONS CREATE A SUBSTANTIAL IMPAIRMENT OF PLAINTIFFS' CONTRACTUAL RIGHTS

Because plaintiffs' retirement health care benefits are a contractual right, the next step is to determine whether the increases in plaintiffs' copayments and deductibles substantially impaired plaintiffs' contractual rights. *Romein v Gen Motors Corp*, 436 Mich 515, 534; 462

15

NW2d 555 (1990).  If plaintiffs' contractual rights are impaired, the impairment must be the result of a legitimate public purpose.  *Id*. at 535.  Finally, the means chosen to carry out the public purpose must be reasonable.

I must first address defendants' argument that the legitimate public purpose of the increases is to ensure that there are sufficient school funds available for children.  I believe that ensuring high quality education for our children is a valuable and worthwhile public purpose that should be one of our state's highest priorities.  However, defendants' argument essentially pits the quality of education for school children against providing adequate health care benefits for retirees.  Yet meeting the needs of school children and meeting the needs of retirees are not mutually exclusive.  While it may be challenging, to say the least, to determine the best way to meet the needs of children and retirees, it does not mean that the commitment made to our state's retirees can be ignored.  Merely because meeting our responsibilities is difficult does not mean that our responsibilities can be abandoned.

Plaintiffs' legitimate expectations are that retirement health care benefits will be continued and plaintiffs' portion of the costs for these benefits will not be significantly altered.  It is not sufficient for

16

defendants to pay the "entire monthly premium" if defendants disproportionately increase the amount that plaintiffs must pay for their deductibles and copayments. Moreover, increasing the amount that plaintiffs must pay over time can certainly amount to a substantial impairment if defendants do in increments what they would not be allowed to do in one large adjustment.

The amount of copayments and deductibles is linked to the amount of the monthly premiums. By increasing copayments and deductibles to extremely high proportions, the defendants could essentially avoid paying any monthly premium. That would not fulfill the terms of the contract. While the statute does not specifically state the amount that the state must pay, like any contract, the words used by the Legislature must be construed to ascertain the intent of the parties. See *Sobczak v Kotwicki*, 347 Mich 242, 249; 79 NW2d 471 (1956).

Whether there has been a substantial impairment is largely a factual question that is better resolved after additional discovery, especially because there have been claimed inaccuracies in some of the documents submitted by defendants. It is reasonable that the amount that plaintiffs must pay will increase in logical proportion to the amount they have historically paid. However, because plaintiffs raise valid concerns about the accuracy of

17

reports submitted by defendants, I believe it is imprudent to determine on the basis of what may amount to be an inadequate record whether the increases pose a substantial impairment.

## IV. CONCLUSION

The years of dedication that public school employees and retirees have committed to educating and caring for the children of our state are worth more than empty promises provided to them by the majority's approach. I believe that retirement health care benefits earned by public school employees constitute "accrued financial benefits" that are protected by our Michigan Constitution from diminishment or impairment. I further believe that retirement health care benefits earned by public school employees are a contractual right created by statute, and whether this contractual right was substantially impaired cannot be determined without further review by the lower courts. Accordingly, I respectfully dissent.

Michael F. Cavanagh
Marilyn Kelly

18